NICOLE KIM (SBN 324698)
*NicoleKim@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa St., 41st Floor
Los Angeles, California 90017
Tel.: +1 213 426 2495
Fax: +1 213 623 1673

SEAN RIORDAN (SBN 255752)
*sriordan@aclunc.org*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA**
39 Drumm Street
San Francisco, California 94111
Tel.: +1 415 621-2493

KYLE VIRGIEN (SBN 278747)
*kvirgien@aclu.org*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
39 Drumm Street
San Francisco, California 94111
Tel.: +1 202 393-4930

EVA BITRAN (SBN 302081)
*ebitran@aclusocal.org*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 West 8th Street
Los Angeles, CA 90017
Tel: +1 213 977-5232

*Attorneys for Petitioners-Plaintiffs
Additional Counsel listed on signature
page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### EUREKA DIVISION

|  |  |
|---|---|
| VICTOR JIMENEZ and JORGE MUTZUTZ,<br><br>          Petitioners-Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; PATRICK LECHLEITNER, Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; MOISES BECERRA, Director of San Francisco Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement,<br><br>          Respondents-Defendants. | Case No. 1:23-cv-06353-RMI<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>**(Failure to provide COVID-19 antiviral medications to medically vulnerable immigrants detained at Golden State Annex)**<br><br>DATE: January 30, 2024<br>TIME: 11:00 A.M. |

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ....................................................................................... 5

I.    INTRODUCTION ........................................................................................................... 5

II.   STATEMENT OF FACTS .............................................................................................. 7

    A.  COVID-19 Poses a Grave Risk to the Plaintiff Class. ............................................. 7

    B.  ICE Denies COVID-19 Antivirals to Medically Vulnerable Class Members. .................. 8

III.  LEGAL STANDARD ...................................................................................................... 11

IV.   ARGUMENT .................................................................................................................... 12

    A.  Plaintiffs are Likely to Succeed on the Merits. ....................................................... 12

        1.  Defendants' Failure to Provide COVID-19 Antiviral Drugs at GSA Violates the
        Fifth Amendment Right to Reasonable Health and Safety. ............................................. 12

        2.  Defendants' Failure to Provide Paxlovid Is Unconstitutional Punishment.............. 18

    B.  Defendants' Failure to Provide Paxlovid Causes Plaintiffs and Other Detainees to Suffer
    Irreparable Harm. ..................................................................................................................... 19

    C.  The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor. ................. 20

    D.  Plaintiffs' Proposed Injunction is Appropriately Tailored. ...................................... 21

        1.  Stocking Antiviral Treatments on Site and Promptly Initiating Treatment ............ 21

        2.  Testing Individuals Who Exhibit Symptoms with a Risk Factor............................. 21

        3.  Evaluation by Provider and Offer of Prescription.................................................... 22

        4.  Educational Materials for Antiviral Treatments ...................................................... 22

        5.  Monthly Reporting ................................................................................................... 23

V.    CONCLUSION ................................................................................................................. 23

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

*Ahlman v. Barnes*,
4
    No. SACV20835, 2022 WL 16957837 (C.D. Cal. Sept. 12, 2022) ................................ 19, 23

5
*Castro v. Cnty. of L.A.*,
    833. F.3d 1060, 1071 (9th Cir. 2016).............................................................................. 12, 13
6

7
*Chimenti v. Wetzel*,
    No. 15-3333, 2018 WL 3388305 (E.D. Pa. July 12, 2018).................................................... 17

8
*City of Revere v. Mass. Gen. Hosp.*,
9
    463 U.S. 239 (1983) ........................................................................................................... 17

10
*Cobine v. City of Eureka*,
    No. C 16-02239, 2016 WL 1730084 (N.D. Cal. May 2, 2016) ............................................ 20
11

12
*Farmer v. Brennan*,
    511 U.S. 825 (1994) ........................................................................................................... 18

13
*Gordon v. Cnty. of Orange*,
14
    888 F.3d 1118 (9th Cir. 2018)........................................................................................... 12, 13

15
*Helling v. McKinney*,
    509 U.S. 25 (1993) ............................................................................................................. 13, 18
16

17
*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017).............................................................................................. 19, 20

18
*Jones v. Blanas*,
19
    393 F.3d 918 (9th Cir. 2004), *cert. denied*, 546 U.S. 820 (2005) ..................................... 18, 19

20
*King v. Cnty. of L.A.*,
    885 F.3d 548 (9th Cir. 2018).............................................................................................. 18
21

22
*M.R. v. Dreyfus*,
    663 F.3d 1100 (9th Cir. 2011), *as amended by* 697 F.3d 706 (9th Cir. 2012)................. 19, 20

23
*Perera v. Jennings*,
24
    No. 21-CV-04136, 2021 WL 2400981 (N.D. Cal. June 11, 2021) ........................................ 19

25
*Pimentel v. Dreyfus*,
    670 F.3d 1096 (9th Cir. 2012).......................................................................................... 12
26

27
*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020)................................................................................*passim*

28

*Roman v. Wolf,*
No. EDCV2000768, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020) ..................................... 23

*Romero-Lorenzo v. Koehn,*
No. CV2000901, 2023 WL 2924882 (D. Ariz. Mar. 30, 2023) ................................. 16, 17, 21

*Sammartano v. First Judicial District Court,*
303 F.3d 959 (9th Cir. 2002) .......................................................................................... 20

*Smith v. Washington,*
781 F. App'x 595 (9th Cir. 2019*)* ...................................................................................... 18

*Stafford v. Carter,*
No. 17-cv-00289, 2018 WL 4361639 (S.D. Ind. Sept. 13, 2018) .......................................... 17

*Urdaneta v. Keeton,*
No. CV-20-00654, 2020 WL 2319980 (D. Ariz. May 11, 2020) .......................................... 13

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ................................................................................................... 11, 20

*Youngberg v. Romeo,*
457 U.S. 307 (1982) ........................................................................................................ 12

*Zepeda Rivas v. Jennings,*
845 F. App'x 530 (9th Cir. 2021) .................................................................................... 14

*Zepeda Rivas v. Jennings,*
No. 3:20-cv-02731-VC, Dkt. 1205-1 (N.D. Cal. Jan. 27, 2022) (attached as
Cipriano Decl., Ex. I) ................................................................................................... 22

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that, on January 30, 2023, at 11:00 a.m., or at the nearest available date at which counsel may be heard, Plaintiffs-Petitioners Victor Jimenez and Jorge Mutzutz ("Plaintiffs") will move for a preliminary injunction to remedy Defendants U.S. Immigration and Customs Enforcement ("ICE"), Patrick Lechleitner, and Moises Becerra's ("Defendants") failures to make available timely and adequate testing and antiviral medication for COVID-19.

The Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the supporting declarations, all pleadings and papers filed in this action, and such additional papers and arguments as may be presented at or in connection with the hearing.

## I.   INTRODUCTION

Years after the SARS-CoV-2 ("COVID-19") pandemic first began, communities across the world continue to grapple with the devastation.  The U.S. helped lead global efforts to rein in COVID-19 through its development of novel vaccines and therapeutics, such as antiviral treatments.  Yet, despite substantial efforts to combat the effects of COVID-19, the U.S. government has failed to fully utilize the tools available to mitigate the risk of severe cases of the virus.  In particular, Defendants have failed to provide proven, effective treatment options for COVID-19 infections to medically vulnerable immigrants that they hold in detention.

The Centers for Disease Control and Prevention ("CDC") and National Institutes of Health ("NIH") currently recommend antiviral treatment for COVID-19 to medically vulnerable people within days of symptom onset.[1]  This antiviral treatment reduces the risk of severe illness and death of medically vulnerable people by nearly 90% percent.[2]  For a year and a half after COVID-19 antivirals became available, Defendants provided no guidance to their detention facilities regarding

---

[1] *COVID-19 Treatments and Medications*, https://www.cdc.gov/coronavirus/2019-ncov/your-health/treatments/treatments-for-severe-illness.html (last updated May 11, 2023); *Coronavirus 2019 (COVID-19) Treatment Guidelines*, https://www.covid19treatmentguidelines.nih.gov/ (last accessed Nov. 1, 2023).
[2] *See* President Joseph Biden, *Remarks of President Joe Biden – State of the Union Address as Prepared for Delivery*, THE WHITE HOUSE (March 1, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/03/01/remarks-of-president-joe-biden-state-of-the-union-address-as-delivered/.

the use of these essential treatments for people in their custody.  Rather, as recently as early May 2023, Defendants recommended the use of monoclonal antibodies for treatment—a treatment option for which the U.S. Food and Drug Administration ("FDA") had revoked emergency authorization due to its lack of efficacy.[3]  Defendants did not update their guidance to even mention the use of antiviral treatment options until May 2023.[4]  Defendants *still* do not require detention facilities to provide antiviral drugs like Paxlovid, nor has ICE updated its formulary to require that facilities stock these medications.  *See* Cipriano Decl., Ex. A.  This failure continues ICE's pattern of disregard for basic COVID-19 safety measures.  For example, a district court found—and the Ninth Circuit affirmed—that ICE exercises "reckless disregard for detainee safety" at another California detention facility.  *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020).  And the Department of Homeland Security ("DHS") found at another ICE facility that medical units are grossly understaffed, detained individuals are not provided with timely medical assistance when requested, and medications to treat the virus are not ordered, dispensed, or administered in time to treat the virus properly.[5]

At ICE's Golden State Annex Detention Center ("GSA"), Defendants fail to adequately and timely identify and treat COVID-19 infections in detained individuals who are medically vulnerable to serious, adverse health outcomes, as the experiences of those detained at GSA demonstrate. Plaintiffs Victor Jimenez and Jorge Mutzutz are both medically vulnerable to COVID-19 due to a documented history of cardiovascular issues, and both qualify for treatment with COVID-19 antiviral medications like Paxlovid.  Mr. Jimenez reported COVID-19 symptoms and was not tested for over two weeks.  Mr. Mutzutz tested positive for COVID-19 and did not receive an antiviral medication.   Declarant Mikhael Moiseev (57 years old) complained about COVID-related symptoms three times before being tested; after testing positive for the virus, she was only provided

---

[3] Joseph Choi, *FDA Pauses Authorization for Last Remaining COVID-19 Monoclonal Antibody Treatment* (last updated Nov. 30, 2022. 4:41 PM),
https://thehill.com/policy/healthcare/3756877-fda-pauses-authorization-for-last-remaining-covid-19-monoclonal-antibody-treatment/.
[4] *See* Dkt. No. 1, at 8.
[5] *Violations of Detention Standards Amid COVID-19 Outbreak at La Palma Correctional Center in Eloy, AZ*, OFF. OF INSPECTOR GEN., DEP'T OF HOMELAND SEC., (Mar. 30, 2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-04/OIG-21-30-Mar21.pdf.

with cough drops, nasal strips, and electrolyte drinks.  Other reports similarly show that GSA has "den[ied] antiviral medication such as Paxlovid" during a recent COVID-19 outbreak.[6]  Plaintiffs seek to represent a class of individuals who are, or will be, detained by ICE at GSA who are 50 years old or over or who have a medical condition that the CDC recognizes as a medical vulnerability to COVID-19[7] ("Class Members" or the "Class").  Defendants' failure to provide adequate and timely COVID-19 antiviral treatments to Class Members violates the Class's Fifth Amendment rights.  Plaintiffs request that this Court enjoin Defendants from further denying the Class timely and adequate access to testing and treatment.

## II.    STATEMENT OF FACTS

### A.  COVID-19 Poses a Grave Risk to the Plaintiff Class.

Through proactive vaccination programs and effective therapeutics, governments across the world have reduced the risks associated with widespread COVID-19 infections to the point where COVID-19 is no longer a global health emergency.  However, the virus remains a serious public health concern, particularly for individuals with medical vulnerabilities.  Since the start of the COVID-19 pandemic, over 772 million cases of COVID-19 infections have been reported globally, of which nearly 7 million cases have resulted in death.[8]  In the U.S., over 1.1 million people have died thus far from COVID-19.[9]  In California—where GSA is located—state officials have reported 12,251,820 total COVID-19 cases and 110,371 total deaths.[10]  The risks of COVID-19 are even greater in detention facilities such as GSA, where congregate living conditions can cause outbreaks to rapidly spread.[11]  And although COVID-19 is a threat to healthy individuals, medically

---

[6] John Donegan, *Detainees, advocates outraged over COVID outbreak at Golden State Annex*, BAKERSFIELD CALIFORNIAN (Sep. 13, 2023), https://www.bakersfield.com/news/detainees-advocates-outraged-over-covid-outbreak-at-golden-state-annex/article_c3a441f4-5288-11ee-9ab5-47c8c213a4f0.html (quotation marks omitted).
[7] *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated May 11, 2023).
[8] *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#maps_percent-covid-deaths (last updated Dec. 11, 2023).
[9] *COVID Data Tracker*, CTR. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated Nov. 27, 2023).
[10] *Track Covid-19 in California*, https://www.nytimes.com/interactive/2023/us/california-covid-cases.html (last updated Dec. 12, 2023).
[11] *COVID-19, Homeless Service Sites & Correctional Facilities,* (Nov. 29, 2022), https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.html ("CDC Detention Guidance").

vulnerable people—including those with certain underlying medical conditions or those over the age of 50—are more likely than healthy persons to be at risk for severe COVID-19, be hospitalized, need intensive care, require a ventilator to help them breathe, or die.[12]  The Class Members are all medically vulnerable individuals most susceptible to serious illness and death from COVID-19.

**B. ICE Denies COVID-19 Antivirals to Medically Vulnerable Class Members.**

The FDA has authorized one antiviral drug for treatment of COVID-19, Paxlovid, and granted emergency use authorization to two others, Veklury and Lagevrio.[13]  The CDC instructs medical providers to provide these antiviral medications to treat COVID-19.[14]  These antiviral drugs are highly effective in reducing the likelihood of serious illness or death from COVID-19.[15]  Numerous studies have shown that Paxlovid is a highly effective treatment option.[16]  For example, clinical trials found that people who were infected with COVID-19 previously or who were vaccinated when taking Paxlovid within five days of diagnosis have a 51% lower hospitalization rate than those not prescribed with the drug.[17]  The established standard of care is to assess and treat all people who are at risk for progression to severe COVID-19 for treatment with these antiviral medications,[18] including people over 50 and people with medical vulnerabilities—in other words, the Class.  As of May 2023, more than 11.6 million treatment courses of Paxlovid alone have been prescribed in the U.S.[19]  Paxlovid is the preferred treatment for COVID-19 and is recommended to be administered within five days of symptom onset unless it cannot be taken

---

[12] *See supra* note 7; *Interim Clinical Considerations for COVID-19 Treatment in* Outpatients, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/outpatient-treatment-overview.html (last updated Nov. 14, 2023).

[13] *See supra* note 1.

[14] *Id.*

[15] *What Are The Possible Treatment Options for COVID-19*, ADMIN. FOR STRATEGIC PREPAREDNESS & RESPONSE, https://aspr.hhs.gov/COVID-19/Treatments/Pages/Possible-Treatment-Options-for-COVID19.aspx (last visited December 12, 2023).

[16] Vijayan Decl., ¶ 12.

[17] *Id.* at ¶¶ 12, 14–15.

[18] *Id.* at ¶ 16.

[19] *Pfizer's Paxlovid Receives FDA Approval for Adult Patients at High Risk of Progression to Severe Covid-19*, https://www.pfizer.com/news/press-release/press-release-detail/pfizers-paxlovidtm-receives-fda-approval-adult-patients (May 25, 2023).

because of some contraindication.[20]  Alternatively, individuals who cannot take Paxlovid due to a contraindication are recommended for treatment with Veklury or Lagevrio.

Despite the standard of care being to treat symptomatic Class Members who test positive for COVID-19 with these antiviral medications, Defendants fail to do so.  On May 11, 2023, ICE updated its administrative guidelines that set the minimal requirements for ICE detention facilities. Cipriano Decl., Ex. B.  ICE's updated guidelines for the first time recommended that each detainee newly diagnosed with COVID-19 be assessed for possible treatment with antivirals; however, ICE does not *require* this assessment.  *Id.* at 16.  Paxlovid, Veklury, and Lagevrio are currently not included in ICE's formulary list—meaning that detention facilities are not required to stock these drugs and medical providers must take additional administrative steps before providing them.  *See* Cipriano Decl., Ex. A.  And even though ICE updated its guidelines again in July 2023, ICE failed to address these deficiencies.  Cipriano Decl., Ex. C.  Moreover, a critical piece of the CDC's guidance, which Defendants fail to enact, is a requirement that antiviral medications be provided in a timely manner to eligible COVID-positive individuals presenting with symptoms.[21]  The effectiveness of COVID-19 antiviral medications depends on their prompt administration after symptom onset—which requires robust testing protocols.[22]  Defendants fail to require consistent testing for COVID-19 of individuals who are detained at GSA.  For example, at the time of filing this Motion, individuals at GSA are only tested for COVID-19 at intake if they present with an elevated temperature or with COVID-like symptoms.  *See* Dkt. No. 1, at 4–6.  Once intake is complete, individuals detained at GSA are only tested after either coming in contact with someone who is COVID-positive or after exhibiting symptoms.  *Id.*

These failures are made clear by Plaintiffs' and Declarant's experiences.  Plaintiff Jorge Mutzutz has a history of cardiovascular issues, including high blood pressure, and wears a heart

---

[20] *Therapeutic Management of Nonhospitalized Adults with Mild to Moderate COVID-19 Who Do Not Require Supplemental Oxygen*, Table 2a, NAT'L INSTS. OF HEALTH (last updated Nov. 2, 2023) https://www.covid19treatmentguidelines.nih.gov/tables/therapeutic-management-of-nonhospitalized-adults/; *see supra* note 1.

[21] *See* CDC Detention Guidance ("Effective treatments are now widely available and must be started within a few days after symptoms develop to be effective.  Support timely treatment for those eligible").

[22] Vijayan Decl., ¶ 25.

monitor.  He is medically vulnerable to serious illness from COVID-19.  *See* Mutzutz Decl., ¶ 5. In August 2023, Mr. Mutzutz contracted COVID-19 while detained at GSA and displayed physical symptoms of the disease including pain in his throat, head, and chest.  *Id.* at ¶ 6.  The facility physician examined Mr. Mutzutz and administered a COVID-19 test.  *Id.*at ¶ 7.  While waiting for the results, the facility physician prescribed Mr. Mutzutz with Zithromax.  *See* Cipriano Decl., Ex. D at 2.  Zithromax (azithromycin) is an antibiotic that is not included in the CDC or NIH treatment recommendations.[23]  In fact, studies have concluded that "adding azithromycin to standard care treatment did not reduce the risk of subsequent hospital admission or death" from COVID-19,[24] and that it increases the chance of complications in COVID-19 patients who, like Mr. Mutzutz and Mr. Jimenez, have a history of cardiovascular issues.[25]  After Mr. Mutzutz tested positive for COVID-19, the facility physician failed to prescribe him an antiviral medication, like Paxlovid. Mutzutz Decl., ¶¶ 8, 10.  Aside from the antibiotic, Mr. Mutzutz was only provided with cough medicine, sore throat lozenges, and Tylenol to treat his COVID-19 infection.  *See* Cipriano Decl., Ex. D. at 2.

Plaintiff Victor Jimenez is a 54-year-old man detained at GSA who suffers from hypertension and cardiovascular issues.  *See* Jimenez Decl., ¶¶ 1, 3.  He was recently held in a unit where multiple people tested positive for COVID-19 and experienced severe symptoms.  *Id.* at ¶ 6. On August 10, 2023, Mr. Jimenez complained to the facility physician that he was experiencing headaches.  *See* Cipriano Decl., Ex. E at 45–48 (showing an August 10, 2023, headache

---

[23] *See supra* note 1.

[24] *See, e.g.*, Timothy S C Hinks, et al., *Azithromycin versus standard care in patients with mild-to-moderate COVID-19 (ATOMIC2): an open-label, randomized trial*, The Lancet Respiratory Medicine (Jul. 9, 2021), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(21)00263-0/fulltext; *see also* Catherine E. Oldenburg, et al. *Effect of Oral Azithromycin vs Placebo on COVID-19 Symptoms in Outpatients with SARS-CoV-2 Infection*, J. OF THE AM. MED. ASSOC. (Jul. 16, 2021), https://jamanetwork.com/journals/jama/fullarticle/2782166 (concluding after a randomized, controlled clinical trial that the "findings do not support the routine use of azithromycin for outpatient SARS-CoV-2 infection").

[25] Maria Bergami, et al. *Relationship Between Azithromycin and Cardiovascular Outcomes in Unvaccinated Patients with COVID-19 and Preexisting Cardiovascular Disease*, J. OF THE AM. HEART ASSOC. (Jul. 14, 2023), https://www.ahajournals.org/doi/10.1161/JAHA.122.028939 (finding that "azithromycin therapy was consistently associated with an increased risk of acute heart failure and death in [COVID-19] patients with preexisting cardiovascular disease").

assessment).  Five days later, Mr. Jimenez reported chest pains and told the physician that it hurt to lay down.  *See id.* at 41–44 (showing an August 15, 2023, chest-pain assessment).  The next day, Mr. Jimenez reported feeling feverish, continued chest pains, and having a runny nose.  *See id.* at 39.  At this point, the physician also prescribed him with Zithromax, allergy medicine, and ibuprofen.  *See id.* at 40.  GSA failed to test Mr. Jimenez for COVID-19 until August 22 when there appeared to be a COVID-19 outbreak at GSA.  *See id.* at 15 (showing Mr. Jimenez was administered a "COVID Abbott Rapid Test" on August 22, 2023).  At this point, twelve days after Mr. Jimenez first presented with COVID-like symptoms, he tested negative.  *See id* at 15, 45–48.  Mr. Jimenez does not know whether the symptoms he experienced in August 2023 were COVID-related because of the delay in testing and failure to confirm his negative result.  Mr. Jimenez continues to fear contracting COVID-19 due to his medical conditions.  Jimenez Decl., ¶ 11  These fears are exacerbated by his conversations with detained individuals who previously contracted COVID-19, who have informed him that they were only provided with Tylenol and water, with no mention of antiviral medication.  *Id.* at 13.

Declarant Mikhael Moiseev is 57 years old.  Moiseev Decl., ¶ 2.  According to the CDC, her age puts her at risk for severe COVID-19, and she qualifies for the use of a COVID-19 antiviral.  When Ms. Moiseev was transferred to GSA, she informed the GSA facility staff of her COVID-like systems on three separate occasions but was not tested for COVID-19 until two weeks after she had first notified the staff of her symptoms.  *Id.* at ¶ 5.  When she was finally tested, and received a positive result, GSA facility staff only provided her with cough drops, nasal strips, and electrolyte drinks, not an antiviral drug.  *Id.* at ¶ 6.

## III.   LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction if they show: (1) "that [they are] likely to succeed on the merits," (2) "that [they are] likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Where the government is a party to a case in which a preliminary injunction is sought, the balance of equities and public interest factors merge." *Roman*, 977 F.3d at 940–41.  Under the Ninth Circuit's sliding

1   scale approach, a stronger showing of one element may offset a weaker showing of another.  *See*

2   *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012).  Where "the balance of hardships . . .

3   tips sharply towards the plaintiff, a plaintiff need only show serious questions going to the merits,

4   rather than likelihood of success on the merits."  *Roman*, 977 F.3d at 941 (internal quotation

5   omitted).  To succeed under the "serious questions" test, Plaintiffs must show only that they are

6   likely to suffer irreparable injury and that an injunction is in the public's interest.  *Id.*

7   **IV.   ARGUMENT**

8      **A.  Plaintiffs are Likely to Succeed on the Merits.**

9      Plaintiffs raise two independent Fifth Amendment violations in this case: (1) the failure to

10   provide conditions of reasonable health and safety; and (2) unconstitutional punishment.  Either

11   permits the Court to enter an injunction.

12      *1.  Defendants' Failure to Provide COVID-19 Antiviral Drugs at GSA Violates the Fifth*

13          *Amendment Right to Reasonable Health and Safety.*

14      The Fifth Amendment requires the U.S. government to provide conditions of reasonable

15   health and safety to people in its custody.  *Roman*, 977 F.3d at 943; *Youngberg v. Romeo*, 457 U.S.

16   307, 315–16 (1982).  The U.S. government violates this right when: "(i) [the U.S. government]

17   ma[kes] an intentional decision with respect to the conditions under which the plaintiff was

18   confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the

19   [U.S.] government did not take reasonable available measures to abate that risk, even though a

20   reasonable official in the circumstances would have appreciated the high degree of risk involved;

21   and (iv) by not taking such measures, the [U.S. government] caused the plaintiff's injuries."  *Roman*,

22   977 F.3d at 943 (citation and alterations omitted).  "With respect to the third element, the

23   defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the

24   facts and circumstances of each particular case.'"  *Castro v. Cnty. of L.A.*, 833. F.3d 1060, 1071

25   (9th Cir. 2016).

26      "[C]laims for violations of the right to adequate medical care" under the Fifth Amendment

27   "must be evaluated under an objective deliberate indifference standard."  *See Gordon v. Cnty. of*

28   *Orange*, 888 F.3d 1118, 1125–26 (9th Cir. 2018) (considering right to adequate medical care under

the Fourteenth Amendment) (cleaned up); *Roman*, 977 F.3d at 943 (applying *Gordon* to Fifth Amendment claims brought by detained immigrants).   A plaintiff need not show that the relevant government officials are "subjectively aware that their [actions are] unreasonable;" they instead must only show that "a reasonable official in the circumstances would have appreciated the high degree of risk involved." *Gordon*, 888 F.3d at 1123, 1125.  These constitutional protections extend to "future harm," including a "condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *See Helling v. McKinney*, 509 U.S. 25, 33 (1993).

i.   *The Government's Refusal to Provide Access to Paxlovid Is Intentional.*

The first *Roman* factor, "the [Government] ma[kes] an intentional decision with respect to the conditions under which the plaintiff was confined," *Roman*, 977 F.3d at 944, requires that either Defendants took an "affirmative act . . . knowingly and purposefully" or, when a claim involves "inaction rather than action," that Defendants' "conduct with respect to the plaintiff was intentional." *Castro*, 833 F.3d at 1070 (9th Cir. 2015).  "For example, if the claim relates to housing two individuals together, the inquiry at this step would be whether the placement decision was intentional." *Id.*  "Or, if the claim relates to inadequate monitoring of the cell, the inquiry would be whether the officer chose the monitoring practices rather than, for example, having just suffered an accident or sudden illness that rendered him unconscious and thus unable to monitor the cell." *Id.*  A decision not to "implement responsive measures specific to high-risk detainees . . . despite knowledge of the acute risks posed to them" by COVID-19 represents an "intentional decision." *Urdaneta v. Keeton*, No. CV-20-00654, 2020 WL 2319980, at *10 (D. Ariz. May 11, 2020).

Here, Defendants have made an intentional decision not to implement responsive measures that would protect the health and safety of the Class despite being fully aware of the risks COVID-19 poses to them.  Defendants' COVID-19 guidelines include a section on treatment of COVID-19 infections for people with risk factors. *See* Cipriano Decl., Ex. C at 16.  This section explains that COVID-19 "can lead to severe symptoms, hospitalization, and death." *Id.*  Court findings of constitutional violations in other lawsuits have also put ICE on notice of the need for measures to

1    protect medically vulnerable detained immigrants from the risk of severe COVID-19.  *See e.g.*,

2    *Roman*, 977 F.3d at 943; *Zepeda Rivas v. Jennings*, 845 F. App'x 530, 534 (9th Cir. 2021).

3         Defendants are also aware of the specific danger posed by the lack of access to COVID-19

4    antivirals.[26]  Defendants' own COVID-19 guidelines acknowledge that "treatment with antiviral

5    medication . . . reduces the risk of progression to severe disease, decreases the need for

6    hospitalization, and reduces the severity of disease thereby improving survival," *see* Cipriano Decl.,

7    Ex. C at 16, and an email from the Chief Pharmacist of Defendant ICE's Health Services Corps

8    that was produced in FOIA litigation notes the importance of "encourag[ing] . . . use of therapeutic

9    products like Paxlovid and Lagevrio to reduce risk of serious outcomes in vulnerable individuals."

10   *See* Cipriano Decl., Ex. F at 1.  In addition, the ACLU wrote a letter to Defendants on January 5,

11   2023, citing evidence showing that Paxlovid significantly decreased the rate of COVID-19

12   hospitalization and of long-term post COVID-19 symptoms.[27]  The letter highlighted CDC

13   guidance urging antiviral treatment to be administered within a few days of symptom onset.[28]

14   Further underscoring Defendants' knowledge that they should provide antiviral treatment is another

15   document produced in the FOIA litigation, which shows ICE's "talking points" for conversations

16   with the press.  *See* Cipriano Decl., Ex. G at 1.  These talking points assure the press that "ICE

17   provides . . . antiviral treatment to detainees who test positive for COVID-19 in accordance with

18   the FDA's emergency use authorizations."  *Id.* at 7.  That Defendants know to tell the press that

19   they provide antiviral drugs—even when those assurances conflict with the poor care Defendants

20   actually provide—shows that Defendants are well aware that they should provide these drugs.

21        Despite knowing the risks associated with COVID-19 and the failure to provide access to

22   antiviral treatments, Defendants chose not to take steps to address these risks.  Plaintiffs and

23   Declarant explain that detained immigrants at GSA are not timely tested and are not offered

24   antiviral medication even when eligible, and Plaintiffs' medical records corroborate their

25

26   [26] *See, e.g.*, Letter from ACLU to Sec. Alejandro Mayorkas, *ICE's Failure to Conduct Custody
     Redeterminations and Ensure Availability of COVID-19 Antiviral Drugs in ICE Detention

27   Facilities* (Jan. 5, 2023), https://www.aclu.org/letter/letter-dhs-re-ices-failure-conduct-custody-
     redeterminations-and-ensure-availability-covid-19.

28   [27] *See supra* note 26.
     [28] *Id.*

explanations.  *See supra* at 8–10.  These statements are further supported by an article about a recent outbreak at GSA explaining that the facility "den[ies] antiviral medication such as Paxlovid."[29]  Defendants' failure to remedy these conditions, despite their knowledge of the particular risks COVID-19 poses to those with medical vulnerabilities, is an intentional decision. *Roman*, 977 F.3d at 943.  Defendants' intent is demonstrated even more starkly by their decision to enact policies that have fallen short of what would be required to ensure access to antiviral medication.  For example, Defendants have yet to list antivirals in their formulary.  *See* Cipriano Decl., Ex. A.  The National Commission on Correctional Health Care defines a formulary as "a written list of prescription and nonprescription medications that are ordinarily available to authorized prescribers . . . working for the facility."  *See* Cipriano Decl., Ex. H at 71.  It explains that although "[t]he presence of a formulary does not necessarily prohibit use of nonformulary medications prescribed by community health professionals," these non-formulary medications are "subject to review and approval by the responsible physician."  *Id.* at 72.  As researchers have observed for other types of medication, "[d]rug formularies are a key determinant of access by incarcerated patients to . . . medications."[30]  Defendants' decision not to list COVID-19 antiviral drugs on their formulary thus decreases the likelihood that detained immigrants who qualify for these medications will receive them.  The delays associated with an additional layer of approval for a non-formulary medication is particularly problematic in the context of COVID-19 antivirals that should be started "within a few days" to maximize their efficacy.[31]  The practical effects of Defendants' decision to leave COVID-19 antivirals off their formulary are apparent in Plaintiffs' experiences.  Both Plaintiffs were denied COVID-19 antivirals and instead were prescribed Zithromax (azithromycin)—a drug that is ineffective against COVID-19 and risks complications for people who, like both Plaintiffs, have cardiovascular issues.[32]  Azithromycin appears on Defendants' formulary, *see* Cipriano Decl., Ex. A at 1, which likely explains why Plaintiffs received it instead of the non-formulary COVID-19 antivirals they actually needed.  Further,

---

[29] *See supra* note 6.
[30] Nathaniel P. Morris, *et al.*, *Drug Formularies in Correctional Settings*, 48 J. OF THE AM. ACADEMY OF PSYCHIATRY AND THE L. 2, 2 (2020) https://jaapl.org/content/48/1/2#xref-ref-24-1.
[31] *See* CDC Detention Guidance.
[32] *See supra* note 24.

although ICE's guidelines for facilities acknowledge that treatment of COVID-19 "appears to work best when started early after the diagnosis is made in appropriately selected patients," they fall short of requiring that people with risk factors be evaluated for this medication.  *See* Cipriano Decl., Ex. C at 16.  Instead, these guidelines merely make a non-binding recommendation "that each detainee newly diagnosed with COVID-19 be assessed for possible treatment," *id.*—a recommendation that the evidence shows is routinely ignored at GSA.  *See supra* at 8–10.  Thus, there is sufficient evidence to show that Defendants made an intentional decision not to timely supply antiviral treatment to the detained individuals.

   ii.   *Defendants' Failure to Supply Antivirals Creates Significant Risk.*

For Class Members, COVID-19 infections pose a serious harm or risk of death if not timely and effectively treated.  The CDC recognizes that "the congregate living arrangements in . . . detention facilities" increases COVID-19 transmission, and COVID-19 risk factors in people in those facilities increases both "the risk of COVID-19 transmission" and "the risk for severe outcomes from COVID-19."[33]  Class Members are at significant risk of serious complications from COVID-19, including major organ damage; blood clots and strokes; long-term neurological, cardiac, and pulmonary issues; and death.[34]  Antiviral medications are highly effective at reducing this risk.[35]  For example, initial clinical trials for Paxlovid showed the drug reduced the risk of hospitalization and death by 89%.[36]  Defendants' failure to ensure the availability of these life-saving COVID-19 drugs thus sharply increases the risk that Class Members will die or face serious complications from COVID-19.  This risk is not merely theoretical: Defendants have reported at least 11 COVID-19 deaths of people in their custody, a likely undercount.[37]  *See Romero-Lorenzo*

---

[33] *See* CDC Detention Guidance.
[34] Vijayan Dec., ¶¶ 6–7; *see also COVID-19 Risks and Information for Older Adults*, https://www.cdc.gov/aging/covid19/index.html (last updated Feb 22, 2023); *see supra* note 7.
[35] *Id.* at ¶¶ 10–15.
[36] *Id.* at ¶ 12.
[37] UCLA Law COVID Behind Bars Data Project, *U.S. Immigrations and Customs Enforcement* (last visited Dec. 14, 2023), https://uclacovidbehindbars.org/ice; Dan Glaun, *How ICE Data Undercounts COVID-19 Victims*, PBS Frontline (Aug. 11, 2020), https://www.pbs.org/wgbh/frontline/article/how-ice-data-undercounts-covid-19-victims/; *see also* Maura Turcotte, Rachel Sherman, Rebecca Griesbach and Ann Hinga Klein, *The Real Toll from Prison Covid Cases May Be Higher than Reported*, NEW YORK TIMES (Aug. 30, 2021), https://www.nytimes.com/2021/07/07/us/inmates-incarcerated-covid-deaths.html.

*v. Koehn*, No. CV2000901, 2023 WL 2924882, at *18 (D. Ariz. Mar. 30, 2023) (finding two COVID-19 deaths in custody to support a showing of significant risk).

   iii.   *Defendants Have Not Taken Reasonably Available Measures to Abate COVID-19 Risks.*

Defendants are not taking "reasonable available measures to abate th[e] risk" that their policies pose to people with COVID-19 risk factors, "even though a reasonable official in the circumstances would . . . appreciate[] the high degree of risk involved." *Roman*, 977 F.3d at 943, 947. When an antiviral medication is available and clinically indicated, the Constitution requires detention facilities to make it available. *Stafford v. Carter*, No. 17-cv-00289, 2018 WL 4361639, at *20 (S.D. Ind. Sept. 13, 2018); *Chimenti v. Wetzel*, No. 15-3333, 2018 WL 3388305, at *9 (E.D. Pa. July 12, 2018).[38] Defendants' policies and practices ignore NIH guidance for COVID-19 treatment, CDC guidance for COVID-19 prevention in detention centers, and the President's statements and stance on how to manage COVID-19.[39] Defendants even acknowledge that antiviral medication "reduces the risk of progression [of COVID-19], decreases the need for hospitalization, and reduces the severity of disease thereby improving survival." *See* Cipriano Decl., Ex. C at 16.

Defendants have failed to implement the reasonably available measures that Plaintiffs seek. Antiviral medications are reasonably available. These antiviral drugs have been widely distributed through hospital and primary care practices throughout the U.S., with over 11 million courses of one drug, Paxlovid, distributed by May of 2023.[40] Antivirals have become the standard of care across the U.S. Vijayan Decl., ¶ 16. The California Correctional Health Services lists both Paxlovid and Veklury on its formulary.[41] "Guidance from the CDC and NIH make clear that such medications are available to detention facilities." *Romero-Lorenzo*, 2023 WL 2924882, at *25. For these reasons, at least one other court has found that a "fact finder could . . . conclude that not

---

[38] *Stafford* and *Chimenti* address claims under the Eighth Amendment by people serving criminal sentences rather than the Fifth Amendment claims at issue here. The Eighth Amendment sets a higher bar than the Fifth Amendment, so these opinions' holdings, a fortiori, apply here. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that "the due process rights of a person … are at least as great as the Eighth Amendment protections available to a convicted prisoner.").

[39] *See supra* notes 1–2.

[40] *See supra* note 19.

[41] California Correctional Health Care Services, *Drug Formulary*, 70 (Rev'd Oct. 13, 2023), https://cchcs.ca.gov/wp-content/uploads/sites/60/MS/CCHCS-CDCR-Formulary.pdf.

having antiviral medications readily available to treat . . . COVID-19 positive detainees is not objectively reasonable" and could violate the Fifth Amendment. *Id.* Here, too, when Defendants fail to make COVID-19 antivirals available, they fail to take "reasonable available measures to abate th[e] risk" Class Members face, in violation of the due process rights of the Class. *Roman*, 977 F.3d at 943.

### iv.   Defendants Caused Plaintiffs' Injuries.

A plaintiff seeking injunctive relief "need only prove a sufficiently imminent danger" to warrant relief under the Fifth Amendment "because a remedy for unsafe conditions need not await a tragic event." *Roman*, 977 F.3d at 943 (citing *Helling*, 509 U.S. at 33–34) (quotation marks omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped [incarcerated people] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."); *Smith v. Washington*, 781 F. App'x 595, 598 (9th Cir. 2019*)* (recognizing harm caused by a pandemic).

Here, Defendants have put the Class in imminent danger caused by the unsafe conditions that Defendants fail to mitigate. *See Roman*, 977 F.3d at 943. The Class is in the agonizing position of being detained in an environment known to drastically increase the risk of contracting COVID-19[42] *while* simultaneously facing potentially life-threatening medical complications from the disease.[43] Defendants deny the Class antiviral medications that are highly effective in preventing serious illness and death from COVID-19.[44] This denial places the Class in imminent danger.

### 2.   Defendants' Failure to Provide Paxlovid Is Unconstitutional Punishment.

In the alternative, Defendants violate the Class's right to be free of punishment in civil detention. The Ninth Circuit has held that conditions of confinement for civil detainees must be *superior* not only to people serving prison sentences, but also to people detained pre-trial. *See Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004), *cert. denied*, 546 U.S. 820 (2005); *King v. Cnty. of L.A.*, 885 F.3d 548, 552, 557 (9th Cir. 2018). The Ninth Circuit has also held that when a civil "detainee is confined in conditions identical to, similar to, or more restrictive than, those in

---

[42] *See* CDC Detention Guidance.
[43] *See supra* note 7.
[44] Vijayan, Decl. ¶ 10.

which his criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'" *Jones*, 393 F.3d at 932. Here, Plaintiffs are being held in more restrictive conditions than their criminal counterparts.

Individuals detained in California's criminal system, either awaiting trial or already convicted, are provided access to COVID-19 antivirals. For instance, the California Correctional Health Care Services includes Paxlovid and Veklury on its formulary,[45] and the Orange County Jail agreed to provide, *inter alia*, "therapeutic antiviral medications" to people confined in the jail. *Ahlman v. Barnes*, No. SACV20835, 2022 WL 16957837, at *2 (C.D. Cal. Sept. 12, 2022). Similarly, San Quentin State Prison recently updated its COVID-19 protocols to make Paxlovid, Veklury, and/or Lagevrio available.[46] Unlike their counterparts described above, Plaintiffs—individuals in civil detention—do not have access to life-saving COVID-19 treatment. This disparity represents unconstitutional punishment because Plaintiffs are being "confined in conditions . . . more restrictive" than their criminal counterparts in the California state prisons and in the Orange County Jail. *Jones*, F.3d at 932.

**B. Defendants' Failure to Provide Paxlovid Causes Plaintiffs and Other Detainees to Suffer Irreparable Harm.**

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (cleaned up). Defendants have violated the Class's Fifth Amendment rights. "Because [they are] likely to succeed on the merits of [their] due process claim, [they have] carried [their] burden as to irreparable harm." *Perera v. Jennings*, No. 21-CV-04136, 2021 WL 2400981, at *5 (N.D. Cal. June 11, 2021) (quotation marks omitted). Dangerous, unsafe detention conditions also constitute irreparable harm. *See Roman*, 977 F.3d at 944 ("The district court also correctly concluded that Plaintiffs were likely to suffer irreparable harm absent relief given COVID-19's high mortality rate."). Likewise, the Class suffers irreparable harm because the Defendants' actions threaten to worsen an individual's health. *See M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011), *as*

---

[45] CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES, *supra* note 65.
[46] Bostyon Johnson, *San Quentin Issues New COVID-19 Protocols*, San Quentin News, 10 (September 2022), https://sanquentinnews.com/wp-content/uploads/2022/10/SQN_Edition_148_September_2022.pdf.

*amended by* 697 F.3d 706 (9th Cir. 2012).  Here, Plaintiffs are denied necessary medical care because Defendants do not provide access to antivirals—despite acknowledging that doing so would improve COVID-19 survivability.  *See* Cipriano Decl., Ex. C at 16.  By refusing the Class adequate access to COVID-19 antivirals, Defendants—at a minimum—threaten to worsen Plaintiffs' health by not having the potentially lifesaving treatment on hand when Plaintiffs inevitably contract COVID-19.  *See M.R.*, 663 F.3d at 1111.  Thus, Plaintiffs have suffered irreparable harm.

### C. The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor.

Plaintiffs are entitled to a preliminary injunction if, among other factors, they can show that the balance of interests tips in their favor.  *See Winter*, 555 U.S. at 20.  When balancing both parties' interests, this Court has held that this balancing tips in a party's favor if it "faces irreparable harm to [its] constitutional rights and health," and "there is no harm to the Government when a court prevents the Government from engaging in unlawful practices."  *Castillo*, 449 F. Supp. 3d at 923.  Indeed, "[f]aced with . . . preventable human suffering, [the Ninth Circuit] ha[s] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor."  *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).  "It is always in the public interest to prevent the violation of a party's constitutional rights."  *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002).  Maintaining these protections is especially important "to those most in need of such [constitutional] protection."  *Cobine v. City of Eureka*, No. C 16-02239, 2016 WL 1730084, at *7 (N.D. Cal. May 2, 2016) (granting injunction because plaintiffs' constitutional injury was irreparable, while the city's potential harm was monetary).

Here, the balance of the equities weighs in favor of the Plaintiffs.  The Class is detained in a congregate facility and all have risk factors for severe COVID-19.  The Class thus faces a preventable, high risk of serious harm from COVID-19 so long as Defendants continue to deny them adequate access to antiviral medication.[47]  Conversely, Defendants face no harm if the Court grants Plaintiffs' injunction.  "[T]here is no harm to the Government when a court prevents the Government from engaging in unlawful practices."  *Castillo*, 2020 WL 1502864, at *6.  Defendants

---

[47] Vijayan Dec., ¶¶ 6–8.

would face no harm because granting Plaintiffs' injunction would require Defendants to simply take steps to convert the non-binding recommendation in their guidance to a mandatory policy.

**D. Plaintiffs' Proposed Injunction is Appropriately Tailored.**

Plaintiffs' attached Proposed Injunction is supported by scientific evidence and tailored to address the constitutional violations.  *Roman*, 977 F.3d at 946 ("[T]he injunction should, to the extent possible, reflect the scientific evidence about COVID-19 presented to the district court.").

**1. *Stocking Antiviral Treatments on Site and Promptly Initiating Treatment***

GSA should initiate treatments of Paxlovid, Veklury, and Lagevrio within 12 hours of a prescription.  Paxlovid and Lagevrio should both be initiated as soon as possible but must be initiated within five days of symptom onset.[48]  Veklury must be initiated within seven days of symptom onset.[49]  CDC guidelines also provide that detention facilities should "[s]upport *timely* treatment for those eligible" with the antiviral drugs mentioned above.[50]  "[P]rompt testing, diagnosis, and provision of treatment is critical."[51]  By the time detained immigrants have noticed their symptoms, reported them, been tested for COVID-19, been evaluated by a provider, and received a prescription days may have elapsed.  Initiating treatment within 12 hours of prescription avoids delays that could impact effectiveness or eligibility.  This timeframe is also reasonable because it comports with ICE's general medical requirements that medications "shall be provided to detainees on schedule and without interruption."[52]  In order to ensure this timely delivery, GSA should stock these three antiviral drugs on site and avoid transportation-related delays.  *Romero-Lorenzo*, 2023 WL 2924882, at *25 (finding it is not "objectively reasonable for a correctional facility not to acquire and stock [COVID-19 antiviral] treatments. . ." on site).

**2. *Testing Individuals Who Exhibit Symptoms with a Risk Factor***

GSA must offer rapid COVID-19 testing to any Class Member who exhibits symptoms. The CDC's guidance to correctional and detention facilities instructs that "treatments … must be

---

[48] Vijayan Dec. ¶¶ 11,15.
[49] *Id*. at ¶ 14.
[50] CDC Detention Guidance (emphasis added); *see also* Vijayan Dec. ¶ 22.
[51] Vijayan Dec. ¶ 16.
[52] *ICE Performance Based National Detention Standards 2011*, 273 (2016 Rev.), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

started within a few days as symptoms develop to be effective."[53]  When a detained immigrant who might qualify for antiviral medication (i.e., a Class Member) reports COVID-19 symptoms, they should receive a rapid test as soon as possible to maximize the odds that they will be diagnosed within an appropriate timeframe for the antiviral medication.[54]  A 24-hour timeframe between reporting of symptoms and testing is readily practicable: ICE requires all medical requests to be "triaged by appropriate medical personnel within 24 hours after a detainee submits the request."[55]  In fact, another nearby ICE facility has committed to test all people within 120 minutes.  *Zepeda Rivas v. Jennings*, No. 3:20-cv-02731-VC, Dkt. 1205-1, at 12 (N.D. Cal. Jan. 27, 2022) (attached as Cipriano Decl., Ex. I).

### 3.   *Evaluation by Provider and Offer of Prescription*

The Court should require that every Class Member at GSA who tests positive within five days of symptom onset be evaluated by a provider consistent with the NIH guidelines (which currently recommend evaluation for Paxlovid, Veklury, and Lagevrio) and be offered one of these drugs if the evaluation indicates it is appropriate for prescription.[56]  For the reasons described above regarding the 24-hour requirement for testing, a 24-hour requirement for this evaluation is important.  Additionally, given the facility's history of noncompliance with basic medical practice, medical staff should be required to document any decisions that conflict with the NIH guidance so that they are in writing and can be reported to Plaintiffs' counsel as described below.

### 4.   *Educational Materials for Antiviral Treatments*

The Court should require GSA to post educational materials on antiviral treatment for COVID-19 in all housing units.  It is particularly crucial that detained immigrants are provided educational materials on COVID-19 antivirals.  In a detention setting, the materials provided by the facility are generally the only source of information.  "In light of the specific risks posed by COVID-19 in carceral settings, the CDC has issued guidance to correctional and detention facilities

---

[53] Vijayan Dec.  22.
[54] *See* Vijayan Dec. ¶ 25.
[55] *See supra* note 52.
[56] *See supra* note 1; *Therapeutic Management of Nonhospitalized Adults with COVID-19* (last updated Nov. 2, 2023), https://www.covid19treatmentguidelines.nih.gov/management/clinical-management-of-adults/nonhospitalized-adults--therapeutic-management/.

to ensure that they support access to COVID-19 antiviral treatment."[57]  ICE has recognized this need for information in the related context of COVID-19 vaccines, requiring "all detention facilities to post educational materials in different languages about the COVID-19 vaccine to help improve vaccine knowledge."  *See* Cipriano Decl., Ex. C at 17.  No such materials are available for COVID-19 antiviral medications.  It is crucial that detained immigrants are aware of their medical treatment options so they can make informed decisions regarding their medical care and so they know the importance of reporting of potential symptoms early.

### 5.  *Monthly Reporting*

The Court should require Defendants to file reports that will help Plaintiffs' counsel verify Defendants' compliance, and to raise any issues with the Court.  Plaintiffs set out their proposed contents of these reports in full in the Proposed Injunction attached to this Motion.  This type of reporting is commonplace in litigation such as this.  *Roman v. Wolf*, No. EDCV2000768, 2020 WL 5797918, at *6 (C.D. Cal. Sept. 29, 2020) (requiring weekly reporting of COVID-related information as part of a preliminary injunction); *Ahlman v. Barnes*, 2022 WL 16957837, at *3 (approving a settlement involving weekly reporting of COVID-related information).

## V.   CONCLUSION

Plaintiffs respectfully request that this Court grant Plaintiffs' motion for a preliminary injunction.

---

[57] Vijayan Dec. ¶ 22.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: December 14, 2023

Sean Riordan (SBN 255752)
*sriordan@aclunc.org*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA**
39 Drumm Street
San Francisco, California 94111
Tel.: +1 415 621-2493

Kyle Virgien (SBN 278747)
*kvirgien@aclu.org*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
39 Drumm Street
San Francisco, California 94111
Tel.: +1 202 393-4930

Eunice Cho (*pro hac vice*)
*echo@aclu.org*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Tel.: +1 202 548-6616

Eva Bitran (SBN 302081)
*ebitran@aclusocal.org*
Mayra Joachin (SBN 306065)
*mjoachin@aclusocal.org*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 West 8th Street
Los Angeles, CA 90017
Tel: +1 213 977-5232

**GOODWIN PROCTER LLP**

By:      */s/ Nicole Kim*

Linnea Cipriano (*pro hac vice*)
*LCipriano@goodwinlaw.com*
Timothy J. Beavers (*pro hac vice*)
*TBeavers@goodwinlaw.com*
Jacob Tyson (*pro hac vice*)
*JTyson@goodwinlaw.com*
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Tel.: +1 212 813 8800

Nicole Kim (SBN 324698)
*NicoleKim@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa St., 41st Floor
Los Angeles, California 90017
Tel.: +1 213 426 2495

Oscar Barron-Guerra (SBN 345284)
*OBarronGuerra@goodwinlaw.com*
**GOODWIN PROCTER LLP**
3 Embarcadero Center, 28th Floor
San Francisco, California 94111
Tel.: +1 415 733 6000

*Attorneys for Petitioners-Plaintiffs*