NICOLE KIM (SBN 324698)
*NicoleKim@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa St., 41st Floor
Los Angeles, California 90017
Tel.: +1 213 426 2495
Fax: +1 213 623 1673

SEAN RIORDAN (SBN 255752)
*sriordan@aclunc.org*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA**
39 Drumm Street
San Francisco, California 94111
Tel.: +1 415 621-2493

KYLE VIRGIEN (SBN 278747)
*kvirgien@aclu.org*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
425 California St., Suite 700
San Francisco, California 94104
Tel.: +1 202 393-4930

EVA BITRAN (SBN 302081)
*ebitran@aclusocal.org*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
SOUTHERN CALIFORNIA**
1313 West 8th Street
Los Angeles, CA 90017
Tel: +1 213 977-5232

*Attorneys for Petitioners-Plaintiffs
Additional Counsel listed on signature
page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### EUREKA DIVISION

| | |
|---|---|
| VICTOR JIMENEZ,<br><br>    Plaintiff,<br><br>  v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; PATRICK LECHLEITNER, Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; MOISES BECERRA, Director of San Francisco Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement,<br><br>    Defendants. | Case No. 1:23-cv-06353-RMI<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**<br><br>DATE: April 2, 2024<br>TIME: 11:00am |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.   DISCUSSION ............................................................................................... 3

    A.   This Court has Jurisdiction Over Plaintiff's Claims, and the Authority to Issue
         Class-Wide Relief. ............................................................................................ 3

    B.   Plaintiff and Proposed New Plaintiffs Have Standing Because Defendants'
         Unconstitutional Policies Place Them in Imminent Risk of Harm. ................... 7

    C.   The Court Should Enter a Classwide Preliminary Injunction. ............................ 9

         1.   Plaintiff Has Shown a Likelihood of Success on the Merits..................... 9

              i.    Defendants Violate the Class's Fifth Amendment Rights to
                    Reasonable Health and Safety. ......................................................... 10

                    a)   Defendants Intentionally Decided Not to Enact Policies that
                         Would Allow for Timely and Adequate Access to Testing
                         and Treatment. ....................................................................... 10

                    b)   Defendants' Decision Placed the Plaintiff Class in Imminent
                         Risk of Harm. ........................................................................ 12

                    c)   Defendants Have Not Taken Reasonably Available
                         Measures to Avoid this Risk of Harm. ............................... 12

                    d)   Defendants' Actions Caused the Class's Injuries by Placing
                         it at Imminent Risk of Harm. .............................................. 15

              ii.   Plaintiff No Longer Includes an Unconstitutional Punishment
                    Theory in this Motion for a Preliminary Injunction. ....................... 17

              iii.  The Class Faces Irreparable Harm. ................................................. 17

              iv.   The Balance of the Equities and Public Interest Favor Relief. ...... 18

              v.    Defendants Do not Contest the Reasonableness of the Specific
                    Provisions of Plaintiff's Proposed Injunction. .............................. 19

III.  CONCLUSION............................................................................................... 20

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Bell v. Wolfish*,
5
 441 U.S. 520 (1979) ................................................................................................... 16

*Biden v. Texas*,
6
 597 U.S. 785 (2022) ..................................................................................................... 4

7

*Castro v. Cnty. of L.A.*,
 833 F.3d 1060 (9th Cir. 2016) ................................................................................... 10
8

*Cath. Soc. Servs., Inc. v. INS*,
9
 232 F.3d 1139 (9th Cir. 2000) (en banc) ..................................................................... 6

10

*Chimenti v. Wetzel*,
 No. 15-3333, 2018 WL 3388305 (E.D. Pa. July 12, 2018) .................................. 9, 14
11

*City of Revere v. Mass. Gen. Hosp.*,
12
 463 U.S. 239 (1983) ..................................................................................................... 7

13

*Comm. of Cent. Am. Refugees v. INS*,
 795 F.2d 1434 (9th Cir. 1986), ECF No. 43 ................................................................ 5
14

*Daskalea v. Dist. of Columbia*,
15
 227 F.3d 433 (D.C. Cir. 2000) ................................................................................... 14

16

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
 489 U.S. 189 (1989) ..................................................................................................... 8
17

*Direct Mktg. Ass'n v. Brohl*,
18
 575 U.S. 1 (2015) ......................................................................................................... 6

19

*Farmer v. Brennan*,
 511 U.S. 825 (1994) ................................................................................................... 12
20

*Fraihat v. U.S. Immigr. & Customs Enf't*
21
 16 F.4th 613 (9th Cir. 2021) ...................................................................................... 15

22

*Freeman v. FDIC*,
 56 F.3d 1394 (D.C. Cir. 1995) ..................................................................................... 6
23

*Galvez v. Jaddou*,
24
 52 F.4th 821 (9th Cir. 2022) ........................................................................................ 4

25

*Garland v. Aleman Gonzalez*,
 596 U.S. 543 (2022) ..................................................................................................... 4
26

27

*Gonzales v. Dep't of Homeland Sec.*,
28
 508 F.3d 1227 (9th Cir. 2000) ..................................................................................... 6

ii

*Helling v. McKinney*,
    509 U.S. 25 (1993) ............................................................................................ 7, 16

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) .................................................................................... 17

*Jensen v. Shinn*,
    609 F. Supp. 3d 789 (D. Ariz. 2022) ...................................................................... 14

*Jones v. Blanas*,
    393 F.3d 918 (9th Cir. 2004) .................................................................................... 13

*Lansdown v. Bayview Loan Servicing, LLC*,
    No. 22-cv-00763-TSH, 2023 WL 2934932 (N.D. Cal. Apr. 12, 2023) ................. 17

*M.R. v. Dreyfus*,
    663 F.3d 1100 (9th Cir. 2011), *as amended by* 697 F.3d 706 (9th Cir. 2012) ...................... 18

*Martinez v. CoreCivic*,
    No. 20-1309 ............................................................................................................... 13

*Parsons v. Ryan*,
    No. CV-12-00601-PHX-NVW, 2014 WL 3887867 (D. Ariz. Aug. 7, 2014) ....................... 16

*Perera v. Jennings*,
    No. 21-cv-04136-BLF, 2021 WL 2400981 (N.D. Cal. June 11, 2021) ................. 18

*Prison Legal News v. Columbia Cnty.*,
    942 F. Supp. 2d 1068 (D. Or. 2013) ...................................................................... 14

*Reyna as Next Friend of J.F.G. v. Hott*,
    921 F.3d 204 (4th Cir. 2019) ..................................................................................... 5

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) ............................................................................ *passim*

*Romero-Lorenzo v. Koehn*,
    665 F. Supp. 3d 1056 (D. Ariz. 2023) .............................................................. *passim*

*Sammartano v. First Jud. Dist. Ct.*,
    303 F.3d 959 (9th Cir. 2002) .................................................................................... 19

*Stafford v. Carter*,
    No. 1:17-cv-00289-JMS-MJD, 2018 WL 4361639 (S.D. Ind. Sept. 13, 2018) .............. 8-9, 14

*Urdaneta v. Keeton*,
    No. CV-20-00654-PHX-SPL (JFM), 2020 WL 2319980 (D. Ariz. May 11,
    2020) ......................................................................................................................... 10

*Ware v. Jackson Cnty.*,
    150 F.3d 873 (8th Cir. 1998) .................................................................................... 14

*West v. Atkins*,
    487 U.S. 42 (1988) ................................................................................................... 14

1

*Wilson v. Ponce*,
    465 F. Supp. 3d 1037 (C.D. Cal. 2020)...................................................................................... 13

*Zepeda Rivas v. Jennings*,
    No. 3:20-cv-02731-LB, ECF No. 500..................................................................................... 8

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.   INTRODUCTION

2

Plaintiff's opening brief on this motion explained the straightforward, narrow issue on

3

which Plaintiff seeks relief. The proposed class (the "Class," defined at ECF No. 21 at 12) lacks a

4

specific type of critical medical care at Golden State Annex ("GSA"). Antiviral medications have

5

become a cornerstone of treatment for people who, like Class members, are medically vulnerable

6

to severe COVID-19 effects. These drugs must be started "within a few days of when your

7

symptoms begin."[1] For that reason, the Centers for Disease Control and Prevention ("CDC")

8

recommend that people "[s]eek health care right away for testing and/or treatment."[2] Antiviral use

9

has become widespread, with more than 11.6 million treatment courses of Paxlovid alone

10

prescribed in the U.S. as of May 2023.[3]

11

At GSA, Defendants deny access to these drugs and to the timely testing that is necessary

12

for someone to be deemed eligible for them. Plaintiff Victor Jimenez reported multiple COVID-19

13

symptoms on August 10, 15, and 16, but GSA medical staff did not provide him with a COVID-19

14

test until August 22—more than ten days after he first reported symptoms. At that point, Plaintiff

15

Jimenez was no longer within the 5-day window to be eligible for COVID-19 antivirals. ECF No.

16

20 at 10-11; *see also* Owolabi Decl., ¶¶ 17-23. Instead of receiving antivirals, he received

17

18

[1] CDC, Treatment of Respiratory Viruses (updated Mar. 1, 2024), https://www.cdc.gov/respiratory-viruses/treatment/index.html. Plaintiffs' opening brief cited the CDC's then-current guidance for

19

COVID measures at detention facilities like GSA. ECF No. 20 at 7 n.11, 9 n.21, 15 n.31, 16 n.33,

20

18 n.42, 21 n.50. The CDC since changed the format of its guidance, merging various separate elements of guidance into a single guidance portal for COVID-19, the flu, and RSV. The substance

21

of the guidance Plaintiff cited in his opening brief is included in this new guidance. CDC, Respiratory Virus Guidance Update FAQs (Mar. 1, 2024) https://www.cdc.gov/respiratory-

22

viruses/guidance/faq.html ("[Detention] settings continue to have high risk for transmission of respiratory viruses due to congregate living conditions, and people living in these settings often

23

have underlying health conditions that increase their risk of severe outcomes from respiratory

24

illnesses . . . . Because individuals' personal prevention decisions are often limited during confinement, many will rely on correctional and detention facilities to provide what they need to

25

protect themselves. It is important for facilities to make sure that the populations in their care and custody can protect themselves from respiratory viruses through . . . providing access to healthcare

26

(including treatment for respiratory illness . . .).").

27

[2] *Id.*
[3] Press Release, Pfizer, Pfizer's PAXLOVID Receives FDA Approval for Adult Patients at High

28

Risk of Progression to Severe Covid-19 (May 25, 2023), https://www.pfizer.com/news/press-release/press-release-detail/pfizers-paxlovidtm-receives-fda-approval-adult-patients.

1    Zithromax, a debunked treatment that has been proven not to help COVID-19 patients while

2    increasing the risk of complications in people who—like Mr. Jimenez—have a history of

3    cardiovascular issues. ECF No. 20 at 10-11; Owolabi Decl., ¶ 20 (using Zithromax's generic name

4    "Azithromycin"). Declarant Mikhael Moisseev, likewise, was not tested for two weeks after she

5    began to feel COVID-19 symptoms. ECF No. 20-13 at ¶ 5; Owolabi Decl., ¶¶ 9-10. As a result, she

6    could not be found eligible for antiviral medication. Former plaintiff Jorge Mutzutz tested positive

7    for COVID-19 while symptomatic, making him eligible for antiviral medication. ECF No. 20 at 9-

8    10. Defendants gave him Zithromax even though he, too, faced risks from that drug due to his

9    history of cardiovascular issues. *Id.*

10        Plaintiff sought relief on a single, straightforward issue, requesting that the Court find that

11    this dangerous lack of medical care violates the Class's Fifth Amendment rights and that it enter a

12    preliminary injunction that would ensure the Class receives adequate treatment while this case

13    proceeds.

14        In response to Plaintiff's motion, Defendants changed their drug formulary to include two

15    COVID-19 antivirals, Paxlovid and Lagevrio. ECF No. 34 at 4. Defendants requested an additional

16    30 days to respond to Plaintiff's motion to allow their counsel "time to work with both ICE and the

17    contractor that overse[e]s GSA, The GEO Group, to determine how this change affects the way in

18    which antiviral medication is obtained and prescribed at GSA." *Id.* Defense counsel represented

19    that "[t]his information could lead to a narrowing of issues before the Court or an out-of-court

20    solution." *Id.* The Court granted Defendants the additional 30 days they requested to gather this

21    information.

22        Concerningly, Defendants' brief filed at the end of this extension contains none of the

23    additional information they promised. Defendants included no new directives or guidance given to

24    medical providers at GSA, no evidence that GSA has changed its problematic testing procedures

25    to make it more likely Class members can receive COVID-19 antivirals, and no evidence that it has

26    changed its deficient practices for treating COVID-19. Over 47 pages of briefing, two declarations

27    by doctors, and one declaration by a nurse, Defendants never explain their use of the debunked

28    treatment Zithromax for COVID-19, assure the Court that they will not continue to use it in place

1    of antiviral medication, or provide safeguards ensuring that Class members will receive timely

2    testing and antiviral medications, should they become eligible for them. ECF Nos. 43, 44, 43-1, 43-

3    2, Owolabi Decl. Defendants even admit that "Golden State Annex has not provided COVID-19

4    antiviral therapies to any detainee." ECF No. 43-2 at ¶ 7.

5         The only conclusion that can be drawn from the utter lack of any factual evidence in

6    Defendants' briefing is that their change to the formulary is a toothless change on paper only, and

7    that they have failed to make any meaningful on-the-ground efforts to provide adequate and timely

8    testing and treatment for COVID-19. More recent evidence from people detained at GSA

9    corroborates this conclusion. Venancio Esteban Riego is a proposed new plaintiff. *See* ECF No. 46.

10   Plaintiff also attaches to this reply a declaration from Gustavo Flores Coreas, whom Plaintiff was

11   unable to include in his motion to add new plaintiffs due to timing, but who stands ready to be

12   considered as a potential new plaintiff after the Court resolves this motion. Flores Coreas Decl., ¶

13   12. Both report that GSA staff did not ask people who had COVID-19 symptoms during recent

14   outbreaks to take a test. ECF No. 46-4 at ¶ 7; Flores Coreas Decl. at ¶ 7. Medical staff *refused* to

15   give Mr. Flores a COVID-19 test even though he had COVID-19 symptoms. Flores Coreas Decl.

16   at ¶ 11. He also reports that he recently asked a nurse whether Paxlovid is available, and she

17   responded that he would not qualify for the drug. *Id.* at ¶ 6.

18        Thus the issue this motion raises remains simple: Defendants are denying the Class access

19   to a medication that would significantly reduce their risk of serious illness and death. This denial

20   of basic medical treatment violates the Fifth Amendment. The Court should enter the concrete,

21   straightforward relief Plaintiffs seek to ensure the Class obtains timely and adequate testing and

22   treatment for COVID-19.

23   **II.    DISCUSSION**

24        **A. This Court has Jurisdiction Over Plaintiff's Claims, and the Authority to Issue**

25            **Class-Wide Relief.**

26        This Court has jurisdiction and authority to order Defendants to ensure adequate, timely

27   COVID-19 testing and provision of antiviral treatment to medically vulnerable class members

28

1   detained at GSA. ECF No. 1 at 19 (Complaint). Contrary to Defendants' argument, 8 U.S.C. §
2   1252(f)(1) does not bar this relief.

3       As an initial matter, 8 U.S.C. § 1252(f)(1) does not deprive lower courts of subject matter
4   jurisdiction, but rather, limits a court's authority to issue class-wide injunctive relief for certain
5   claims. *Biden v. Texas*, 597 U.S. 785, 798 (2022). Section 1252(f)(1) limits the authority of lower
6   courts to "enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221-1232]" on a class-
7   wide basis.[4]

8       Defendants claim that the injunctive relief Plaintiff requests in this case would restrain the
9   operation of (1) 8 U.S.C. §§ 1226(a) and (c); (2) 8 U.S.C. § 1231(a)(1)(A)-(B); and (3) 8 U.S.C. §
10  1231(g)--statutes that govern who can be detained, who can be released, and how ICE can establish
11  detention facilities. ECF No. 43 at 12. But nothing about the requested injunctive relief would
12  interfere with the authority or implementation of these provisions. The requested relief does not
13  affect who gets detained or who gets released, or ICE's ability to establish detention facilities.
14  Plaintiff simply seeks the provision of adequate and timely COVID-19 tests and antiviral
15  medication, which is not remotely addressed by the statutes that Defendants invoke. That
16  distinguishes this case from *Garland v. Aleman Gonzalez*, where the plaintiffs sought to enforce a
17  bond hearing requirement they read into a detention statute covered by Section 1252(f)(1). 596 U.S.
18  543 (2022). That is not the case here.

19      None of the statutes that Defendants invoke address medical care in detention. Section
20  1226(a) provides ICE with the authority to arrest and detain individuals pending a removal decision,
21  or release them on bond or conditional parole, and limits the provision of work authorization to
22  people released from detention. 8 U.S.C. § 1226(a). Likewise, Section 1226(c) provides that ICE
23  "shall take into custody" individuals who are inadmissible or deportable as a result of having

24  _____

25  [4] 8 U.S.C. § 1252(f)(1) provides that: "no court (other than the Supreme Court) shall have
26  jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this
    subchapter . . . other than with respect to the application of such provisions to an individual alien
27  against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). "Because §
    1252(f)(1) is located within Title 8, Chapter 12, Subchapter II of the United States Code, the
28  reference in § 1252(f)(1) to 'the provisions of part IV of this subchapter' appears to refer to 8 U.S.C.
    §§ 1221–1232." *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022).

committed certain criminal offenses or engaged in terrorist activities. 8 U.S.C. § 1226(c). 8 U.S.C. § 1231(a)1)(A)-(B) does not address detention at all, only the terms of removal. An injunction ordering Defendants to provide COVID-19 tests and antiviral treatment to medically vulnerable people at GSA will not interfere with or restrain ICE's ability to arrest, detain, or release non-citizens pursuant to these statutory detention authorities.[5] Under Plaintiffs' requested relief, Defendants are free to exercise their authority to detain and release people as they see fit; they simply must ensure that those detainees are treated humanely, in accordance with Constitutional requirements, while they do so. Nothing in Sections 1226 or 1231 addresses such conduct.

Nor will Plaintiffs' requested injunction interfere with ICE's authority or ability to carry out Section 1231(g), which instructs the agency to "arrange for appropriate places of detention." As another court concluded, Section 1231(g) relates "to the government's brick and mortar obligations for obtaining facilities in which to detain aliens." *Reyna as Next Friend of J.F.G. v. Hott*, 921 F.3d 204, 209 (4th Cir. 2019). Section 1231(g) permits the agency to expend appropriated funds for detention without competitive bids and requires that ICE consider the availability of existing facilities prior to constructing new detention centers.[6] Plaintiff's requested injunction has no impact on anyone's place of detention. It would merely require Defendants to provide basic medical care in the form of COVID-19 tests and antiviral medication to individuals detained at GSA—an issue about which Section 1231(g) says nothing.

Defendants claim that the requested injunction would "enjoin or restrain the operation" of these statutes but cannot point to any specific impediment to their statutory obligations. They speculate that providing COVID-19 tests and antiviral medication to class members would "intrude into the day-to-day administration of operations at GSA as it would require increased monitoring and recording of information," require changes that might jeopardize ICE's contract with GEO,

---

[5] To the extent that Defendants may also argue that the requested injunction interferes with 8 U.S.C. § 1231(a)(2), this argument fails for the same reason. Section 1231(a)(2) requires the detention of people convicted of certain crimes or who have engaged in terrorist activity. The requested injunction would not impede this authority.

[6] Defendants' citation to *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986), ECF No. 43 at 12 n.13, is inapposite, as the statute cited is not 8 U.S.C. § 1231(g). Moreover, the other statutes cited regarding ICE's contract authority do not fall within the ambit of Section 1252(f)(1).

and "force ICE to have to choose between no longer detaining individuals at GSA or paying additional costs to do so." ECF No. 43 at 14. But these potential effects are entirely hypothetical at this juncture, and it would be absurd to dismiss Plaintiff's claim for injunctive relief now because Defendants *might*, at some later point, take actions that have some tenuous relationship to the requested relief. Moreover, Defendants' speculation is demonstrably false, as additional COVID-19 mitigation requirements resulting from court orders are explicitly contemplated in ICE's mandatory guidelines for contract detention facilities.[7]

Defendants' expansive interpretation of Section 1252(f)(1)—that even speculative, collateral effects of an injunction would trigger its limits—is incorrect. Section 1252(f)(1) only prohibits orders that directly "enjoin or restrain" the operation of the covered provisions, not orders that would merely "affect" them. Unlike other statutes that use broader language to bar injunctions of certain covered activities, Section 1252(f)(1) includes only the words "enjoin or restrain," but does not include the words "affect" when referring to the covered provisions. *Compare Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) (concluding that inclusion of word "affect" in 12 U.S.C. § 1821(j) to limit court restraint of the Federal Deposit Insurance Corporation's power is a "sweeping ouster of courts' power to grant equitable remedies") *with Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 12-13 (2015) (concluding that "enjoin, suspend or restrain" in 28 U.S.C. § 1341 refers only to court orders that "stop" tax collection, not orders that "merely inhibit" it). *See also Cath. Soc. Servs., Inc. v. INS*, 232 F.3d 1139 (9th Cir. 2000) (en banc) (concluding that Section 1252(f)(1) does not cover effects on INA provisions not identified in (f)(1)); *Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2000) (same).

Defendants' suggested reading of Section 1252(f)(1) would expand its scope to a startling degree, making it functionally impossible for federal courts to address constitutional violations regarding conditions of confinement in immigration detention. This interpretation is untenable, and

---

[7] U.S. Immigration and Customs Enforcement, *Post Pandemic Emergency COVID-19 Guidelines and Protocols, Version 2.0* at 5 (July 13, 2023), https://www.ice.gov/doclib/coronavirus/eroCOVID19PostPandemicEmergencyGuidelinesProtocol_07132023.pdf [https://perma.cc/B642-UW65] ("For facilities subject to court orders or settlement agreements regarding COVID-19 . . . such facilities must continue to adhere to those orders or settlement agreements even where they impose more stringent requirements.").

1  this court has the jurisdiction and authority to issue Plaintiff's requested injunction on a class-wide

2  basis.

3      **B.  Plaintiff and Proposed New Plaintiffs Have Standing Because Defendants'**

4          **Unconstitutional Policies Place Them in Imminent Risk of Harm.**

5          Defendants seek to dismiss this case based on an argument that Mr. Jimenez lacks standing.

6  Defendants argue that he does not satisfy the requirement that he allege "an injury in fact." ECF

7  No. 43 at 15 (quoting *Spokeo, Inc v. Robins*, 578 U.S. 330, 338 (2016)). Defendants' argument

8  neglects the voluminous precedent supporting claims for prospective relief like the relief Plaintiff

9  seeks. "That the [constitution] protects against future harm to inmates is not a novel proposition."

10  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).[8] "It would be odd to deny an injunction to inmates

11  who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing

12  yet had happened to them." *Id.* For that reason, plaintiffs seeking injunctive relief "need only prove

13  a sufficiently imminent danger" to warrant relief under the Fifth Amendment "because a remedy

14  for unsafe conditions need not await a tragic event." *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir.

15  2020) (citing *Helling*, 509 U.S. at 33-34) (quotation marks omitted). Plaintiff Jimenez and the other

16  Proposed New Plaintiffs remain at imminent risk of harm because of Defendants' unlawful

17  COVID-19 policies. Defendants' addition of antiviral pills to the IHSC Medication Formulary is a

18  meaningless change if the facility does not adequately test for COVID-19 at the facility or fails to

19  provide the antiviral medication to those eligible.

20          As Defendants acknowledge, Plaintiff Jimenez has been tested for COVID-19 only *once*

21  while at GSA even though there have been multiple reported COVID-19 outbreaks at the facility.

22  The one test Plaintiff took was provided to him twelve days after he began reporting COVID-19

23  symptoms. ECF No. 43 at 8; *see also* ECF No. 20 at 11; ECF No. 20-11 at ¶¶ 6-7. It is unsurprising

24  that Plaintiff tested negative when the facility failed to conduct a prompt COVID-19 test.

25  _____

26  [8] Plaintiffs cite some law addressing claims under the Eighth Amendment by people serving
   criminal sentences rather than the Fifth Amendment claims at issue here.  The Eighth Amendment

27  sets a higher bar than the Fifth Amendment, so these opinions' holdings, a fortiori, apply here. *City
   of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that "the due process rights of a

28  person … are at least as great as the Eighth Amendment protections available to a convicted
   prisoner.").

1    Defendants cannot prove that Mr. Jimenez has not contracted COVID-19 at GSA or that he has not

2    been injured by their unlawful policies as the facility has failed to test him in a timely manner, and

3    Defendants continue to deny tests and adequate treatment to others in the Class. *See e.g.,* Flores

4    Coreas Decl. at ¶¶ 11-12 (explaining how he was not provided a COVID-19 test despite asking for

5    it and how other individuals at GSA have contracted COVID-19 without receiving adequate testing

6    or treatment); ECF No. 46-3 at ¶ 8 (observing how others "got[] very sick with COVID-19 and

7    have not been tested or received adequate treatment.").

8         Plaintiff and Proposed Class Representatives continue to be at imminent risk of contracting

9    COVID-19 in the future at the facility. Defendants' arguments concerning the risk level at the

10   facility and Plaintiffs' risk of future harm are once again undermined by their inadequate testing

11   policies. *See*  ECF No. 43 at 16 (highlighting that GSA is a "green/low risk" facility).  Defendants

12   cannot accurately rely on the purported low number of COVID positive cases when ICE has

13   intentionally failed to mandate testing of individuals experiencing COVID-19 symptoms to avoid

14   having to implement COVID-19 safety measures. *See Zepeda Rivas v. Jennings*, No. 3:20-cv-

15   02731-LB, ECF No. 500 at 1 (finding that "defendants have avoided widespread testing of staff

16   and detainees at the facility, not for lack of tests, but for fear that positive test results would require

17   them to implement safety measures that they apparently felt were not worth the trouble"). This

18   intentional decision to mandate testing results in people who are "visibly sick" not taking COVID-

19   19 tests. ECF No. 46-4 at ¶ 7; *see also* Flores Coreas Decl. at ¶ 7 (declaring that people with "fever,

20   difficulty breathing, congestion, and cough" were not given COVID tests).

21        Furthermore, Defendants' arguments that the "end of the pandemic" and "availability of

22   COVID-19 vaccines and treatments" undermine Plaintiffs' imminent "high risk or serious harm

23   from COVID-19" are also misplaced.  ECF No. 43 at 3. The Constitution does not protect only

24   those who can allege a global health emergency. Instead, it establishes a basic right to essentials

25   including "food, clothing, shelter, medical care, and reasonable safety" behind bars. *DeShaney v.*

26   *Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). This right applies broadly to

27   necessary medical care, including the provision of antiviral medication when clinically indicated.

28   *E.g.*, *Stafford v. Carter*, No. 1:17-cv-00289-JMS-MJD, 2018 WL 4361639, at *20 (S.D. Ind. Sept.

13, 2018) (finding constitutional entitlement to antivirals against Hepatitis C, even though there is no Hepatitis C global health emergency); *Chimenti v. Wetzel*, No. 15-3333, 2018 WL 3388305, at *9 (E.D. Pa. July 12, 2018) (same). Defendants also fail to show a decreased risk within GSA. Outside of GSA, COVID-19 has resulted in fewer hospitalizations as the number of people who are vaccinated grows and access to antiviral treatment has broadened, but Class members lack access to these protective measures that have provided some relief elsewhere. *See* ECF No. 46-4 at ¶¶ 5-6 (stating that he has not seen COVID-19 vaccines or antiviral pills available at GSA); Flores Coreas Decl. at ¶ 5 (declaring that booster shots are only provided at GSA after several people request the booster); *see also Romero-Lorenzo v. Koehn*, 665 F. Supp. 3d 1056, 1096 (D. Ariz. 2023) (rejecting an argument that a "showing that the risk of COVID-19 has decreased significantly in the general population" rendered the case moot because, "Defendants fail to link these changes to the specific [facility] prevention measures" at issue in the case). Additionally, even outside of GSA, there are still "significant numbers of people getting sick," and COVID-19 remains a significant cause of long-term disability and death.[9]

Plaintiff thus remains in "sufficiently imminent danger" of contracting COVID-19. *Roman*, 977 F.3d at 943 (citation omitted); *see also Romero-Lorenzo*, 665 F. Supp. 3d at 1079 (rejecting Defendants' mootness argument based in part on "evidence that Defendants have not administered a single treatment of Paxlovid or other antiviral"). The two COVID-19 vaccinations and two boosters Mr. Jimenez received three years ago, while in prison, do not eliminate his current risk of contracting the virus and being especially vulnerable because of his underlying medical conditions. Other Proposed New Plaintiffs are similarly at risk due to their age, medical conditions, and the inadequate testing and treatment at the facility. *See* ECF No. 46-3 at ¶¶ 1, 3, 7-8; ECF No. 46-4 at ¶¶ 3, 5-6, 11; Flores Coreas Decl. at ¶¶ 4, 6-11. This Court need not wait for "a tragic event" to occur to issue injunctive relief. *Id.*

### C. The Court Should Enter a Classwide Preliminary Injunction.

#### 1. *Plaintiff Has Shown a Likelihood of Success on the Merits.*

---

[9] Rong-Gong Lin II, *Has California's COVID-19 winter surge peaked? Here's what the data show*, L.A. Times (updated Feb. 9, 2024), https://www.latimes.com/california/story/2024-02-07/has-californias-covid-19-winter-surge-peaked-heres-what-the-data-show.

1

2

> i. *Defendants Violate the Class's Fifth Amendment Rights to Reasonable Health and Safety.*

3   The parties agree that the Court should analyze the Class's right to reasonable health and

4   safety using the framework set out in *Roman*, 977 F.3d at 943. ECF No. 20 at 12; ECF No. 43 at

5   17. Under this test, the U.S. government violates the right to reasonable health and safety when:

6   > (i) [the U.S. government] ma[kes] an intentional decision with respect to the

7   > conditions under which the plaintiff was confined; (ii) those conditions put the

8   > plaintiff at substantial risk of suffering serious harm; (iii) the [U.S.] government did

9   > not take reasonable available measures to abate that risk, even though a reasonable

10  > official in the circumstances would have appreciated the high degree of risk

11  > involved; and (iv) by not taking such measures, the [U.S. government] caused the

12  > plaintiff's injuries. *Roman*, 977 F.3d at 943 (citation and alterations omitted).

13  > a) *Defendants Intentionally Decided Not to Enact Policies that Would Allow for*

14  > *Timely and Adequate Access to Testing and Treatment.*

15  Plaintiffs' opening brief set out the relevant law on this element of the *Roman* test for a

16  claim that involves "inaction rather than action": that Defendants' "conduct with respect to the

17  plaintiff was intentional." *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070 (9th Cir. 2016); *see also*

18  ECF No. 20 at 13. "For example, if the claim relates to housing two individuals together, the inquiry

19  at this step would be whether the placement decision was intentional." *Castro*, 833 F.3d at 1070.

20  "Or, if the claim relates to inadequate monitoring of the cell, the inquiry would be whether the

21  officer chose the monitoring practices rather than, for example, having just suffered an accident or

22  sudden illness that rendered him unconscious and thus unable to monitor the cell." *Id.* Plaintiff also

23  pointed to the protocols Defendants have issued to GSA and other detention facilities setting out

24  Defendants' requirements to address COVID-19 at these facilities. ECF No. 20 at 13 (citing ECF

25  No. 20-4 at 16). Those protocols are intentional, and where they fall short, those failings are

26  intentional as well. *See Urdaneta v. Keeton*, No. CV-20-00654-PHX-SPL (JFM), 2020 WL

27  2319980, at *10 (D. Ariz. May 11, 2020) (finding a decision not to "implement responsive

28  measures specific to high-risk detainees . . . despite knowledge of the acute risks posed to them"

1   by COVID-19 represents an "intentional decision"). Defendants do not dispute this law, nor do

2   they dispute that they have chosen to implement these protocols. This disposes of the "intentional

3   decision" inquiry. *Roman*, 977 F.3d at 943.

4          Defendants attempt to argue that their actions were unintentional by pointing to guidance

5   they have published that "outlines how to prescribe and administer several antivirals as well as the

6   timeline that should be followed" and "encourage[s] the use of antiviral medications," ECF No. 43

7   at 18. Defendants' position is that their "encourage[ment]" and "promoti[on]" of antiviral

8   medications is enough to make their failings unintentional. It is not. Defendants fail to address the

9   ample evidence that detained immigrants at GSA are not timely tested and are not offered antiviral

10  medication, even when eligible. ECF No. 20 at 14-15.

11         For example, Defendants admit that, under current policies, sourcing a medication for

12  treatment of detained people at GSA generally takes 24-48 hours. ECF No. 43-2 at ¶ 10.  For a

13  medication that has to be prescribed within five days of symptom onset, this delay is significant

14  (not even accounting for the time it takes for a detained immigrant to be tested and to be able to see

15  a physician). This failure to change this policy to ensure timely availability is an intentional

16  decision. *See Romero-Lorenzo*, 665 F. Supp. 3d at 1089 ("A fact finder could also conclude that

17  not having antiviral medications readily available to treat . . . COVID-19 positive detainees is not

18  objectively reasonable."). Defendants' unsupported assertion that they will drive to a local

19  pharmacy to pick up medication if it is needed sooner is not sufficient to remedy the violation of

20  the Class's Fifth Amendment rights. *See* ECF 43-2 at ¶ 13. *See Romero-Lorenzo*, 665 F. Supp. 3d

21  at 1088-89 (denying summary judgment argument that being able to obtain antiviral medications

22  from local pharmacies is sufficient for Fifth Amendment purposes).

23         Defendants argue that despite "GSA's medical team evaluat[ing] specifically for COVID-

24  19 antiviral therapies in line with applicable guidance," "no antiviral therapies have been clinically

25  indicated." ECF 43-2 at ¶ 7. But Defendants' confidence that no antiviral therapies have been

26  clinically indicated for any detained immigrants at GSA is undermined by lack of timely testing,

27  the number of COVID-19 outbreaks GSA has experienced in the recent months, and the significant

28  number of medically vulnerable detainees at the facility. Defendants' intentional decision to not

enact policies that would ensure timely and adequate access to testing and treatment violates the Class's Fifth Amendment rights to reasonable health and safety.

Defendants choosing not to remedy these failings to ensure that there is meaningful access to the antiviral medication, that detained individuals are aware of the medications' availability, and that there is adequate testing to assess whether the antiviral pills need to be provided, despite full knowledge of the particular risks that COVID-19 poses to those with medical vulnerabilities, is the intentional decision at issue. *Roman*, 977 F.3d at 943.

> b) *Defendants' Decision Placed the Plaintiff Class in Imminent Risk of Harm.*

As explained above, Defendants' policies fail to provide the Class with timely and adequate access to testing and antiviral medication for COVID. *Supra* at 11-12. The Class thus remains at high risk of contracting COVID-19 due to inadequate testing and the unsafe nature of detention. Individuals detained at the facility are not provided COVID-19 tests even when they ask for testing or are visibly sick with COVID-19 symptoms. *See e.g.,* Flores Coreas Decl. at ¶¶ 11-12 (explaining how he was not provided a COVID-19 test despite asking for it and how other individuals at GSA have contracted COVID-19 without receiving adequate testing or treatment); ECF No. 46-3 at ¶ 8 (observing how others "got[] very sick with COVID-19 and have not been tested or received adequate treatment."). In fact, since this case commenced, conditions of confinement at GSA have only worsened. The detainee population has increased in past weeks, causing more individuals to share each dormitory and increasing the risk of exposure to COVID-19 for all individuals detained at GSA.

The Plaintiff class continues to be detained in "unsafe conditions" that place them in grave risk of contracting COVID-19. *Roman*, 977 F.3d at 943. Defendants' recent failure to mitigate the risk of COVID-19 for Class members GSA by correcting inadequate testing and instead only issuing a toothless policy concerning antiviral medications places the Class at significant risk of harm. *E.g.*, ECF No. 20-14 at ¶ 24. Defendants "are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

> c) *Defendants Have Not Taken Reasonably Available Measures to Avoid this Risk of Harm.*

Defendants' opposition includes a single section that covers three issues. It addresses factor three (ECF No. 43 at 19-21) and factor four (ECF No. 43 at 21-22) of the *Roman* test for a violation of the class's right to reasonable health and safety. This section then turns to the class's right to be free of unconstitutional punishment under *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (ECF No. 43 at 22-24). The right to reasonable health and safety under *Roman* is separate from the right to be free of unconstitutional punishment under *Jones*, and the two rights involve independent legal analyses. *See Roman*, 977 F.3d at 943 n.4. In analyzing these separate rights, the Court should not conflate them as Defendants have. Plaintiff thus replies to Defendants' combined section with three separate sections that address the three analytically separate points Defendants raise. Plaintiff begins with the third *Roman* factor.

Plaintiff and Defendants agree on the relevant standard for this factor: the Court should analyze whether Defendants have taken "reasonable and available measures that could have eliminated" "an excessive risk to the plaintiff['s] health and safety." ECF No. 43 at 20 (quoting *Fraihat v. U.S. Immigr. & Customs Enf't* 16 F.4th 613, 636 (9th Cir. 2021)).

Defendants cannot dispute that providing timely and adequate access to testing and COVID-19 antiviral medication is a reasonable and available measure. In fact, ICE entered into an agreement with a pharmacy service ensuring "nationwide use and availability of COVID-19 antivirals." ECF No. 43-1 at ¶ 19. Defendants also must admit the practical reality that "Golden State Annex has not provided COVID-19 antiviral therapies to any detainee." ECF No. 43-2 at ¶ 7.

Defendants base their argument, instead, on their toothless policies that vaguely "encourage" the timely use of antiviral treatment, that refer to the CDC guidance, and that add two COVID-19 antivirals to their formulary. ECF No. 43 at 20.[10] But "the existence of written policies

---

[10] Defendants cite two opinions where courts rejected claims based on COVID-19 risk because the pandemic had evolved beyond the state of immediate emergency of the Spring of 2020. ECF No. 43 at 21 (citing *Wilson v. Ponce*, No. 20-4451-MWF (MRWx), 2022 WL 2155119, at *8 (C.D. Cal. Feb. 2, 2022); *Martinez v. CoreCivic*, No. 20-1309 WJ/CG, 2021 WL 2550319, at *7 (D.N.M. June 22, 2021)). But those two cases, brought early in the pandemic, sought releases to home confinement based on the state of immediate emergency. *Wilson v. Ponce*, 465 F. Supp. 3d 1037, 1046 (C.D. Cal. 2020); *Martinez*, 2021 WL 2550319, at *1. This case, in contrast, simply asks that Defendants provide medication that is commonly available outside of ICE detention—a claim that does not require a state of emergency. *Romero-Lorenzo*, 665 F. Supp. 3d at 1079 (rejecting an argument that the existence of a COVID vaccine mooted claims that included failures to administer

1  of a defendant are of no moment in the face of evidence that such policies are neither followed nor

2  enforced." *Ware v. Jackson Cnty.*, 150 F.3d 873, 882 (8th Cir. 1998); *see also Daskalea v. Dist. of*

3  *Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000) ("[A] 'paper' policy cannot insulate a municipality

4  from liability where there is evidence, as there was here, that the municipality was deliberately

5  indifferent to the policy's violation."); *Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068,

6  1088 (D. Or. 2013) (finding that a facility's failure to deliver magazines to incarcerated people

7  violated the First Amendment despite a policy stating that magazines should be delivered). Nor can

8  Defendants absolve themselves of responsibility by simply pointing to their decision to contract

9  out the administration of GSA and its healthcare. *See West v. Atkins*, 487 U.S. 42, 56 (1988)

10  ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide

11  adequate medical treatment to those in its custody . . . ."); *Jensen v. Shinn*, 609 F. Supp. 3d 789,

12  843 (D. Ariz. 2022) ("[T]he critical issue is not the contract staffing level [set in negotiations

13  between the prison system and its medical provider]. Rather, the issue is whether the actual staffing

14  numbers, which are far below the contract staffing level, present a substantial risk of serious harm

15  to prisoners.").

16      Here, the on-the-ground facts about the actual COVID-19 treatment the Class receives are

17  indisputable. First, Defendants fail to test people in time for them to be eligible for Paxlovid. Mr.

18  Jimenez reported multiple COVID-19 symptoms on August 10, 15, and 16, but medical staff did

19  not provide him a COVID-19 test until August 22, at which point he was no longer within the 5-

20  day window to receive COVID-19 antivirals. ECF No. 20 at 10-11. Ms. Moisseev, likewise, was

21  not tested for two weeks after she began to feel COVID-19 symptoms. ECF No. 20-13 at ¶ 5.

22  Others' more recent declarations corroborate these facts: Mr. Riego and Mr. Flores Coreas report

23  that GSA staff did not ask people who had COVID-19 symptoms during recent outbreaks to take a

24  test. ECF No. 46-4 at ¶ 7; Flores Coreas Decl. at ¶ 7. Mr. Flores Coreas reports that even though he

25  had COVID-19 symptoms, medical staff refused to give him a COVID-19 test. Flores Coreas Decl.

26  at ¶ 11. Second, even when medically vulnerable people are timely diagnosed, GSA medical staff

27
28  COVID antiviral medication); *see also, e.g., Stafford*, 2018 WL 4361639, at *20 (finding
    constitutional entitlement to antivirals against Hepatitis C, even though there is no Hepatitis C
    pandemic emergency); *Chimenti*, 2018 WL 3388305, at *9 (same).

1    fail to provide antiviral drugs. For example, Mr. Mutzutz is medically vulnerable and was

2    diagnosed with a "COVID 19 INFECTION" after experiencing a "dry cough, pleuritic chest pain,

3    sore throat and body ache of 2 days duration." Cipriano Decl., Ex. D at 1-2; *see also* ECF No. 20-

4    12 at ¶¶ 6-8. He plainly fell within the criteria to be evaluated for an antiviral—he is medically

5    vulnerable, was COVID-19-positive, and began experiencing symptoms within the past five days.

6    *See* ECF No. 20-14 at ¶ 16. The facility did not prescribe an antiviral drug. ECF No. 20-12 at ¶ 8;

7    *see also* Cipriano Decl., Ex. D at 2. Mr. Flores Coreas, a former smoker with latent tuberculosis, is

8    medically vulnerable and thus eligible for COVID-19 antivirals. Flores Coreas Decl. at ¶ 4.[11] After

9    testing positive for COVID-19 in August of 2023, he asked for Paxlovid and was told medical staff

10   could not give it to him. Flores Coreas Decl. at ¶ 9. He recently asked medical staff again whether

11   he would be able to obtain Paxlovid if he got COVID-19 again, and they told him he would not

12   qualify. Flores Coreas Decl., ¶ 6.[12]

13       By failing to ensure that GSA medical staff timely and adequately test for COVID-19 and

14   provide treatment when appropriate, Defendants have failed to take reasonably available measures

15   to address the risk that COVID-19 poses to the medically vulnerable people they detain. Nor do

16   Defendants argue, as they must to prevail, that the class faces no imminent danger from untreated

17   COVID-19. *Id.*

18           d)  *Defendants' Actions Caused the Class's Injuries by Placing it at Imminent*

19               *Risk of Harm.*

20

[11]  CDC, People with Certain Medical Conditions (updated May 11, 2023),
21   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-
     conditions.html (listing "former cigarette smoker" and "tuberculosis" as risk factors).
22   [12] Defendants cite *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 637 (9th Cir. 2021), to
23   argue that Ninth Circuit has already found ICE's COVID policies sufficient. This argument
     misconstrues *Fraihat*. In that case, the Plaintiffs did not "seek relief specific to the conditions at
24   the detention centers in which they were housed." *Id.* at 618. "They instead challenged ICE's
     nationwide COVID-19 directives, asking a district court mid-pandemic to assume control over the
25   top-level policies governing ICE's efforts to combat the viral outbreak." *Id.* The Ninth Circuit
     explained that "[t]o obtain the extraordinary relief they sought, plaintiffs needed to come forward
26   with evidence of constitutional and statutory violations on a programmatic, nationwide level." *Id.*
     The Ninth Circuit held that the *Fraihat* plaintiffs did not meet this high burden. Here, Plaintiffs
27   heeded the Ninth Circuit's warning and brought a case "bounded by a more narrowly drawn
     common experience, such as conditions at a particular facility." *Id.* at 637. They supported this case
28   through ample evidence about specific conditions at GSA.

1    Finally, Defendants caused the Class's injuries by taking actions that put it at imminent

2 risk of harm. As Plaintiff explained in his opening brief, "[a] plaintiff seeking injunctive relief 'need

3 only prove a sufficiently imminent danger' to warrant relief under the Fifth Amendment 'because

4 a remedy for unsafe conditions need not await a tragic event.'" ECF No. 20 at 18 (quoting *Roman*,

5 977 F.3d at 943). Defendants do not disagree with this standard. ECF No. 43 at 21-22 (citing only

6 *Roman*).[13] The class meets this standard. Defendants' denial of adequate and timely testing and

7 treatment places the class—all of whom are medically vulnerable to severe COVID-19—in

8 imminent risk of harm from untreated COVID-19. *See* ECF No. 20 at 18.

9    Rather than disputing the risk of harm that the Class faces, Defendants argue that this

10 element is not satisfied because the class representative "never tested positive for COVID-19" and

11 thus raises only "speculative" injuries. ECF No. 43 at 22 (emphasis omitted).[14] This argument is

12 wrong as a matter of law. The Supreme Court has explained that "[i]t would be odd to deny an

13 injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the

14 ground that nothing yet had happened to them." *Helling*, 509 U.S. at 33. Consequently, in a class

15 action seeking injunctive relief, defendants cannot defeat a claim based on "exposure of inmates to

16 a serious, communicable disease on the ground that the complaining inmate shows no serious

17 current symptoms." *Id.*; *see also Parsons v. Ryan*, No. CV-12-00601-PHX-NVW, 2014 WL

18 3887867, at *3 (D. Ariz. Aug. 7, 2014) ("[E]ven assuming that each Named Plaintiff received

19 constitutionally adequate medical care, that alone does not prove the absence of systemic

20 deficiencies in the provision of medical care."). Defendants thus fail to address the legally relevant

21 question: "the overall risk of harm stemming from inadequate policies and practices." *Parsons*,

22 2014 WL 3887867, at *3.

23    Defendants' argument also is wrong because it misconstrues the facts. As explained above,

24 Defendants failed to provide Mr. Jimenez adequate care by failing to timely test him. *Supra* 16. It

25 is misleading for Defendants to claim that his lack of a positive test demonstrates that they provided

26 ───────────────

27 [13] Defendants later cite *Bell v. Wolfish*, 441 U.S. 520, 539 (1979), to discuss the standard for "unconstitutional punishment." ECF No. 43 at 22. However, this discussion relates to Plaintiff's unconstitutional punishment claim, and it has no place in the analysis for the fourth *Roman* factor.

28 [14] Defendants also repeat their argument that their decision was not "intentional." Plaintiff addressed this argument above. *See supra* 11-13.

1    him adequate care. To the contrary, his lack of a positive test demonstrates that Defendants denied

2    him adequate testing.[15]

3    　　　Defendants' failures placed the class at imminent risk of harm from untreated COVID-19,

4    satisfying this element.

5    　　　　　　　　*ii.   Plaintiff No Longer Includes an Unconstitutional Punishment Theory in this*

6    　　　　　　　　　　*Motion for a Preliminary Injunction.*

7    　　　Plaintiff's motion sought a preliminary injunction based on two independent theories. The

8    first theory, addressed above, involves the Class's right to reasonable health and safety. This theory

9    finds its primary support in on-the-ground evidence about Defendants' failures to provide medical

10   care at GSA. The second theory involves the Class's right to be free from unconstitutional

11   punishment. At this pre-discovery stage, Plaintiff based that theory on evidence about the paper

12   formulary policies for GSA and for several California criminal facilities. Defendants changed their

13   paper formulary policy after Plaintiff filed his motion. As explained above, this change to

14   Defendants' paper policy does not change the on-the-ground realities that the Court should remedy

15   under the Class's right to reasonable health and safety. *Supra* 14-17. So that the Court can focus on

16   remedying those on-the-ground problems through Plaintiff's reasonable health and safety theory,

17   Plaintiff no longer pursues his unconstitutional punishment theory at this preliminary injunction

18   stage.

19   　　　　　　　　*iii.  The Class Faces Irreparable Harm.*

20   　　　In the two pages Defendants devote to arguing how Plaintiff fails to show irreparable injury

21   absent injunctive relief, Defendants did not address that "[i]t is well established that the deprivation

22   of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872

23   

24   _____

25   [15] Defendants also briefly raise a related argument that there is low risk at the facility because only
     24 people tested positive between July 2023 and February 6, 2024, and because Defendants' own
     assessment of risk at the facility is "green." ECF No. 43 at 22 (citing ECF No. 43-1 at ¶¶ 22-25).

26   But the number of positive tests, again, is indicative not of safe conditions but of Defendants' failure
     to test people at the facility. The "green" risk level, too, is based on the number of people in medical

27   isolation for COVID-19, which is indicative only of the number of people who have received a
     positive test result—not of the number of people truly at risk. ECF No. 43-1 at ¶ 24 (explaining that

28   a "Green" status is based on the "medical isolation rate"), page 16 (indicating that "[d]etainees who
     test positive" will "[i]solate").

F.3d 976, 994 (9th Cir. 2017) (cleaned up) (citation omitted). The constitutional nature of Plaintiff's harm is alone enough to warrant injunctive relief. Defendants' failure to address this argument concedes this point. *Lansdown v. Bayview Loan Servicing, LLC*, No. 22-cv-00763-TSH, 2023 WL 2934932, at *4 (N.D. Cal. Apr. 12, 2023) ("a failure to respond in an opposition to an argument constitutes waiver or abandonment, and thus 'concedes the argument.'") (citation omitted). "Because [he] is likely to succeed on the merits of his due process claim, [Plaintiff] has carried his burden as to irreparable harm." *Perera v. Jennings*, No. 21-cv-04136-BLF, 2021 WL 2400981, at *5 (N.D. Cal. June 11, 2021) (brackets, citation, and quotation marks omitted). Plaintiffs need not show any other irreparable harm to satisfy this factor.

Even if constitutional harm is not enough to establish irreparable harm, again, as stated in Plaintiff's motion, even in a post-vaccine world, and despite Defendants' addition of two antiviral medications to its formulary list, Defendants violate detained immigrants' Fifth Amendment right to reasonable health and safety by failing to ensure that there is meaningful access to and awareness of the antiviral medications and that there is adequate testing to assess whether the individual qualifies to receive the medication. ECF No. 20 at 19-20; *see Romero-Lorenzo*, 665 F. Supp. 3d at 1088. The Class is irreparably harmed when Defendants' actions threaten to worsen an individual's health, like they do here. *See M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011), *as amended by* 697 F.3d 706 (9th Cir. 2012). Lack of access to necessary, potentially lifesaving treatment threatens to worsen Plaintiff's health given taking chances with Plaintiff's health surely is not improving or ensuring his health at all. Thus, Plaintiff has suffered irreparable harm for this additional reason.

### iv. The Balance of the Equities and Public Interest Favor Relief.

Defendants do not contest that a violation of someone's constitutional right—such as the violation of Plaintiff's Fifth Amendment right to reasonable health and safety—is sufficient to warrant injunctive relief. Defendants have consequently waived any argument in response, and this Court should view the waiver as dispositive.

Defendants instead argue that the relief Plaintiffs request "threatens to disrupt ICE's operations at detention facilities" because it "will require substantial changes to ICE detention

facility operations and intergovernmental service agreements." ECF No. 43 at 26. Yet Defendants' arguments are not grounded in any concrete evidence demonstrating that the relief sought will disrupt the daily administration of GSA or infringe on the facility's operations in enforcing immigration laws. Because ICE is already subject to other injunctions and settlements imposing COVID-19 relief (at times "more stringent requirements"), Defendants could have introduced evidence showing how such relief affects an individual facility's operations and administrations if such evidence existed.[16] Their inability to provide any evidence to support their argument only demonstrates that they *can* implement the relief requested without suffering any significant administrative burdens. In any event, any "administrative" challenges Defendants may face because of the relief requested does not compare to the irreparable harm plaintiffs can suffer if they continue to be deprived of meaningful access to antiviral medication.

Plaintiffs are entitled to injunctive relief as the balance of equities here weighs in their favor. The relief requested is sufficiently narrowly tailored to only concern treatment of COVID-19 antiviral pills and does not infringe on any public interest there may be in the government's enforcement of immigration laws. ECF No. 43 at 26. In contrast, the public's interest is better served by preventing the ongoing violation of Plaintiffs' constitutional rights. *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogation recognized by Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022).

> ### v. Defendants Do not Contest the Reasonableness of the Specific Provisions of Plaintiff's Proposed Injunction.

Plaintiff's opening brief explains why each provision of the classwide injunction he seeks is narrowly tailored and supported by the evidence before the Court. ECF No. 20 at 21-23. Defendants argue generally that injunctive relief is unwarranted, but they do not dispute the appropriateness of any particular contour of Plaintiff's proposed injunction. Thus it is undisputed that if the Court grants injunctive relief, it should include the terms of Plaintiff's proposed injunction (ECF No. 20-15).

---

[16] *See* ECF No. 43-1 at 28 (acknowledging that some facilities are "subject to court orders or settlement agreements related to COVID-19" including orders or agreements with "more stringent requirements" than the COVID-19 Guidelines and Policies issued by ERO).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**III.    CONCLUSION**

For the foregoing reasons, the Court should issue the classwide preliminary injunction set out in Plaintiff's Proposed Injunction (ECF No. 20-15).

Dated: March 11, 2024

**GOODWIN PROCTER LLP**

By:    */s/ Nicole Kim*

Sean Riordan (SBN 255752)
*sriordan@aclunc.org*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA**
39 Drumm Street
San Francisco, California 94111
Tel.: +1 415 621-2493

Kyle Virgien (SBN 278747)
*kvirgien@aclu.org*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
425 California St., Suite 700
San Francisco, California 94104
Tel.: +1 202 393-4930

Eunice Cho (*pro hac vice*)
*echo@aclu.org*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Tel.: +1 202 548-6616

Eva Bitran (SBN 302081)
*ebitran@aclusocal.org*
Mayra Joachin (SBN 306065)
*mjoachin@aclusocal.org*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA**
1313 West 8th Street
Los Angeles, CA 90017
Tel: +1 213 977-5232

Linnea Cipriano (*pro hac vice*)
*LCipriano@goodwinlaw.com*
Timothy J. Beavers (*pro hac vice*)
*TBeavers@goodwinlaw.com*
Jacob Tyson (*pro hac vice*)
*JTyson@goodwinlaw.com*
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel.: +1 212 813 8800
Fax: +1 212 355 3333

Nicole Kim (SBN 324698)
*NicoleKim@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa St., 41st Floor
Los Angeles, California 90017
Tel.: +1 213 426 2495
Fax: +1 213 623 1673

Oscar Barron-Guerra (SBN 345284)
*OBarronGuerra@goodwinlaw.com*
**GOODWIN PROCTER LLP**
3 Embarcadero Center, 28th Floor
San Francisco, California 94111
Tel.: +1 415 733 6000
Fax: +1 415 677 9041

*Attorneys for Petitioners-Plaintiffs*