UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| VICTOR JIMENEZ, et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>   Defendants. | Case No. 23-cv-06353-RMI<br><br>**ORDER RE: PENDING MOTIONS**<br><br>Re: Dkt. Nos. 21, 21, 50 |

Now pending before the court is Plaintiffs' First Amended Complaint ("FAC") (dkt. 68), Plaintiffs' Motion for Preliminary Injunction (dkt. 20), Plaintiffs' Motion to Certify Class (dkt. 21), and Defendants' Motion to Dismiss (dkt. 50). The matters have been fully briefed (*see* dkts. 50, 52, 53, 55, 57, 58, 59), and the Parties have presented their positions at oral argument (*see* dkt. 71). For the reasons stated below, Plaintiffs' motions are denied without prejudice, Defendant's motion is granted, and the FAC is dismissed with leave to amend.

## FACTUAL BACKGROUND

Plaintiffs Victor Jimenez, Venancio Esteban Riego, and Jose Orozco Cuevas, bring this case on behalf of themselves and other similarly situated persons and claim that Defendants (two named officials of U.S. Immigration and Customs Enforcement) ("ICE") have failed to provide frequent testing for COVID-19 and antiviral medications to medically vulnerable immigrants detained at the Golden State Annex (or "GSA"). *See* FAC (dkt. 68) at 1-2. The court takes all of the FAC's plausible allegations as true. Plaintiffs are medically vulnerable individuals detained at GSA, while they await adjudication of their civil immigration cases. *Id*. at ¶ 4. Due to the close quarters involved in detention facilities, COVID-19 poses a greater threat to those held in ICE

1  detention than in the general public. *Id*. at ¶ 5. In addition to the preventative measures of COVID-

2  19 vaccines, several antiviral treatments have also been developed – Paxlovid and Lagevrio can be

3  taken orally, while Veklury can be taken via intravenous infusion at a healthcare facility. *Id*. at ¶ 2.

4  Plaintiffs state that "if they were to contract COVID-19, [they] want to receive COVID-19

5  antiviral medications; however, Plaintiffs and others in ICE detention have previously been denied

6  antiviral medications after testing positive for COVID-19." *Id*. at ¶ 6.

7         The FAC goes on to state that notwithstanding the fact "that ICE detains a large number of

8  people who are medically vulnerable to serious illness and death from COVID-19, and despite

9  knowing that antiviral medication is critically important to the treatment of COVID-19,

10  Defendants have failed to ensure that people in their custody nationwide can receive antiviral

11  medication in accordance with CDC and National Institutes of Health ("NIH") guidance." *Id*. at ¶

12  7. Defendants have issued post-pandemic guidelines to the effect: that antiviral medication

13  treatment is effective against a particular variant of SARS-CoV-2; that antiviral medication

14  reduces the risk of progression to severe disease; that it decreases the need for hospitalization; and

15  that it reduces the severity of disease thereby improving survival. *Id*. at ¶ 8. However, rather than

16  dispensing the medicine upon every single positive test, Defendants have only recommended that

17  each detainee newly diagnosed with COVID-19 be assessed for possible antiviral treatment. *Id*.

18  Plaintiffs allege that this recommendation is insufficient because "people with medical

19  vulnerabilities have tested positive for COVID-19 while held at Golden State Annex and have not

20  been offered COVID-19 antivirals." *Id*.

21         Consequently, the FAC alleges that Defendants' policy of not automatically offering

22  antiviral treatment upon a positive test for COVID-19 to Plaintiffs and the putative class (that is,

23  all civil immigration detainees over the age of 50 who have medical conditions that the CDC

24  recognizes as medically vulnerable to COVID-19) places them at an unreasonable risk of serious

25  illness and death and constitutes an unlawful punishment of the members of the class members. *Id*.

26  at ¶ 9. Plaintiffs add that the effectiveness of these antiviral medications depends on their prompt

27  administration after symptom onset and requires robust testing and symptom-monitoring protocols

28  – they allege that Defendants fail to require consistent testing for COVID-19 at the Golden State

Annex. *Id*. at ¶ 10. Furthermore, they allege that because ICE considers the status at the Golden State Annex to be "green," the COVID-19 screening protocols are relaxed to only require that individuals detained there receive temperature checks and verbal symptoms screenings during the intake process. *Id*. If detainees newly admitted to the Golden State Annex are identified with an elevated temperature or COVID-like symptoms, only then are they tested for COVID-19; however, at other facilities designated with a "red" status, all new detainees are tested for COVID-19 at the time of their admission. *Id*. The ICE "guidelines do not require periodic testing of individuals detained at GSA unless those individuals present with COVID-like symptoms or are determined to have come in contact with an individual who has tested positive for COVID-19." *Id*. at ¶ 11.

Appearing to narrate anecdotal evidence – but without specifying whether the anecdote refers to any known individuals (including Plaintiffs) or specifying the ultimate outcome of the anecdote – the FAC states that: "even when individuals at the facility have reported symptoms, GSA personnel have ignored the risk that those individuals may have COVID-19, instead suggesting that the symptoms may be for other reasons, like sinus problems[,and] [i]n those instances, medically vulnerable individuals with COVID-19 have waited days, or even weeks, before they were tested for COVID-19, rendering these individuals ineligible for antiviral medication under the CDC and NIH guidelines." *Id*. The FAC does not venture to describe anything further about the persons involved in this anecdote – that is, whether their COVID-19 tests were positive or negative, whether their illness was mild or severe, or whether the identified symptom was or was not due to sinus problems after all.

Plaintiffs then add that "[w]ithout prompt and adequate testing and provision of COVID-19 antiviral medication, Plaintiffs and Class Members lack adequate protection against serious illness and death from COVID-19[, and] [t]his Court should order Defendants to immediately make available and provide Plaintiffs and all similarly situated individuals held at GSA with antiviral medication, by directing GSA to identify medically vulnerable people in Defendants' custody, timely test them for COVID-19, and provide them with antiviral medication upon their testing positive for COVID-19." *Id*. at ¶ 12.

3

As to the medications, Plaintiffs note that Paxlovid has been shown to reduce the risk of COVID-19 hospitalization and death of symptomatic, unvaccinated people who are at high risk for severe COVID-19 by 89%, while reducing the risk of hospitalization for vaccinated individuals or those with prior infections by 51%. *Id*. at ¶ 27. Those who are unable to take Paxlovid due to a medical complication may be treated with alternatives such as Veklulry (Redemsivir) or Lagevrio (Molnupiravir). *Id. at ¶* 28. The FAC alleges that Lagevrio should be taken within five days of symptom onset and Veklury should be taken within seven days of symptom onset. *Id*. However, the FAC is silent about the potential implications, if any, involved with being administered Paxlovid, Lagevrio, or Veklury later than five or seven days after the onset of symptoms, or whether there would be a difference in cases where the person was vaccinated or unvaccinated, or in cases where the symptoms were mild versus severe.

In any event, Plaintiffs allege that these antiviral medicines are widely available, and that the federal government maintains an ample supply "with millions of treatment courses still in the field." *Id*. at ¶ 30. Without specifying their vaccination status, Plaintiffs each allege that they are medically vulnerable to severe COVID-19 and face an unreasonable risk of serious illness and death from COVID-19 without the critical treatment option of antiviral medication. *Id*. at ¶ 31. Plaintiff Jimenez has a history of hypertension and is "currently on five different kinds of medication to treat his cardiovascular issues." *Id*. at ¶ 32 Plaintiff Orozco Cuevas also has hypertension; and Plaintiff Riego has hypertension, diabetes, an aneurysm, and dissection of the aorta. *Id*. at ¶¶ 33-34. The FAC then goes on to generally assert that Defendants are unreasonably and intentionally denying Plaintiffs and class members adequate and timely testing and antiviral medication or COVID-19. *Id*. at ¶¶ 35-43.

Each of the named Plaintiffs then asserts that "[d]espite expressing [their] fears to GSA of contracting COVID-19, GSA facility staff have failed to inform [them] of the availability of antiviral medications in the event [they] contract[] COVID-19[, and therefore] [Plaintiffs] fear[] that if [they] contract[] COVID-19 at GSA, [they] will not be offered antiviral medication." *Id*. at ¶¶ 44-46. The FAC then describes the cases of two former GSA detainees – one of whom tested positive for COVID-19 and was "never offered antiviral medications," and another who tested

4

1    positive but was only provided with cough drops, nasal strips, and electrolyte drinks rather than
2    antiviral medications. *Id*. at ¶ 47-48. However, the FAC does not describe the experience of these
3    two individuals or the outcome of their illness or course of treatment in any greater detail – that is,
4    it is unknown what symptoms they had, how severe those symptoms were, how long they lasted,
5    whether the symptoms were determined to be related to the positive COVID-19 test, how quickly
6    they recovered, what other medical evaluations were administered, and what course of treatment
7    was determined to be necessary by their care providers and why. Instead, the FAC only complains
8    in general terms that "[o]n multiple occasions, rather than treating individuals with antiviral
9    medications, GSA facility staff only provided detained individuals who tested positive for
10   COVID-19 with water and aspirin, including [the two former detainees mentioned above], who
11   presented with physical symptoms, are medically vulnerable to severe COVID-19, and qualify for
12   antiviral treatment." *Id*. at ¶ 49.
13        On the basis of these allegations, the FAC raises two claims. The first claim asserts that the
14   Fifth Amendment due process right of Plaintiffs and the putative class members has been violated
15   in that they have been denied access to adequate medical treatment. *Id* at ¶¶ 51-55, 69-76. The
16   essence of this claim rests on Plaintiffs' allegation that "[b]y detaining Plaintiffs and Class
17   Members at GSA without adequate and timely testing and antiviral treatment for COVID-19,
18   Defendants are failing to ensure Plaintiffs' and Class Members' reasonable health and safety,
19   exposing them to an increased risk of serious harm from COVID-19, [and] violating their rights
20   under the Fifth Amendment." *Id*. at ¶ 71. As to the second claim, the FAC posits that because
21   criminal state detention facilities in California list these antiviral medications as being available to
22   individuals who test positive for COVID-19, and because those medications have not been offered
23   to persons held under civil immigration detention authority at the Golden State Annex, one must
24   conclude that Plaintiffs are being "held in more restrictive conditions than their counterparts in
25   criminal detention" – meaning that Defendants' failure to ensure Plaintiffs' automatic access to
26   COVID-19 antiviral treatment when they test positive of COVID-19 necessarily constitutes
27   "punishment" in violation of their substantive due process right. *Id*. at ¶ 56-58, 77-81. On the
28   above-recited bases, Plaintiffs have also filed a motion for preliminary injunction (dkt. 20) and a

1   motion for class certification (dkt. 21).

2         As attachments to Plaintiffs' preliminary injunction motion, Plaintiffs have submitted a
3   number of declarations. One Plaintiff stated that during the most recent outbreak, nurses evaluated
4   the temperature and vital signs of the detainees, and when others in his unit tested positive for
5   COVID-19, they would be quarantined away – this Plaintiff stated that he had spoken to those
6   who had tested positive for COVID-19 and they told him that they were only given water and
7   Tylenol and nothing else. *See* Pls.' Decl. #1 (dkt. 20-11) at 3-4. Of course, what is missing from
8   this declaration is any indication that the COVID-19 symptoms were not abated by whatever
9   treatment was provided; or whether they had any underlying conditions; or what was the duration
10  or outcome of their experience with COVID-19. Another declaration, from a former Plaintiff,
11  stated that when he tested positive for COVID-19, he was treated (but not with Paxlovid) and
12  quarantined during a period in which he continued to experience a sore throat, muscle pain and
13  shortness of breath; this person also stated that he overheard other detainees requesting a different
14  medicine or to be taken to the hospital, and stated that he did not see any instances where GSA
15  staff addressed those concerns. *See* Pls. Decl. #2 (dkt. 20-12) at 3-4. However, this declaration
16  suffers from the same shortcomings – the outcomes of the former Plaintiff's COVID-19
17  experience (as well as the outcomes of the persons whose anecdotes were narrated) are omitted, as
18  are any details about his vaccination status, or any details about the treatment providers' diagnoses
19  of his symptoms (i.e., whether they were, in fact, related to the positive COVID-19 test). A third
20  declaration submitted by Plaintiffs suffer from the same defects. *See* Pls. Decl. Nos. #3 (dkt. 20-
21  13). Plaintiffs have also submitted a declaration from Tara Vijayan, M.D., Ph.D., an associate
22  professor of medicine in the infectious disease department at the UCLA School of Medicine – in
23  short, Dr. Vijayan recommends frequent COVID-19 testing and immediate administering of
24  antiviral drugs for the treatment of patients who have at least one risk factor for progression to
25  severe COVID-19 as soon as possible after symptom onset. *See* Vijayan Decl. (dkt. 20-14) at 10.

## **DISCUSSION**

27        Defendants contend that the FAC should be dismissed because Plaintiffs do not have a
28  cognizable injury traceable to Defendants because "none of the Plaintiffs have ever tested positive

1    for COVID-19 while detained at GSA and they are detained at a facility that has not experienced a

2    significant number of COVID-19 cases since August 2023." *See* Defs.' Sur-Reply (dkt. 59-2) at 6;

3    *see also* Defs.' Mot. (dkt. 50) at 8. Defendants also contend that the court should "deny Plaintiff's

4    motion for preliminary injunction for lack of jurisdiction because under a straightforward

5    application of 8 U.S.C. §1252(f)(1), which bars courts from enjoining or restraining the operation

6    of "relevant statutory provisions" of the INA, the Court lacks jurisdiction to issue the class-wide

7    injunctive relief Plaintiffs seek." Defs.' Mot. (dkt. 50) at 7 (citing *Garland v. Aleman-Gonzalez*,

8    596 U.S. 543, 544 (2022)).

9          The court will first note that the government's reliance on *Aleman-Gonzalez*'s

10   interpretation of §1252(f)(1) seems misplaced as it relates to this case. Regarding the jurisdiction

11   to enjoin, in *Aleman-Gonzalez*, the Supreme Court noted that §1252(f)(1) provides that "no court

12   (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the

13   operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration

14   Reform and Immigrant Responsibility Act of 1996" – however, the Court also added that "the

15   provisions of part IV of subchapter II of the Immigration and Nationality Act . . . charge the

16   Federal Government with the implementation and enforcement of the immigration laws *governing*

17   *the inspection, apprehension, examination, and removal of aliens*." *Aleman-Gonzalez*, 142 S. Ct.

18   at 2064 (emphasis added). Because it does not appear that Plaintiffs' request for preliminary

19   injunction would involve anything other than directing specific medical services – to wit, COVID-

20   19 testing and antiviral treatment – for immigration detainees, it does not appear that such an

21   injunction would have the effect of interfering with or otherwise affecting the "enforcement of the

22   immigration laws governing the inspection, apprehension, examination, and removal of aliens," in

23   any way remotely resembling what was at issue in *Aleman-Gonzalez*, which involved enjoining

24   the government from detaining individuals pursuant to section §1231(a)(6) for more than 180 days

25   without providing each person a bond hearing. However, those questions do not need to be

26   resolved today because Plaintiffs' motions for class certification and injunctive relief are due to be

27   denied because the FAC is due to be dismissed without prejudice as discussed below.

28         Defendants have moved to dismiss Plaintiffs' FAC for failure to establish standing. "While

review for failure to state a claim under 12(b)(6) is generally confined to the contents of the complaint, [] in determining constitutional standing, 'it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975), and citing *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)). A lack of constitutional standing "requires dismissal for lack of subject matter jurisdiction," whereas a "lack of statutory standing requires dismissal for failure to state a claim." *Maya*, 658 F.3d at 1067.

A motion to dismiss for lack of standing is brought pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) (noting that, "[b]ecause standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss"). Such a motion can be either facial or factual in nature. *See Pride v. Correa*, 719 F.3d 1130, 1139 (9th Cir. 2013). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Here, Defendants have challenged constitutional standing through a facial attack. Constitutional standing consists of three elements: (1) the plaintiff must have suffered an injury in fact; (2) the injury must be fairly traceable to the challenged conduct of the defendant; and (3) the injury is likely to be redressed by a favorable judicial decision. *See Lujan v. Defenders of Wildlife*, 504 U. S. 555, 559-560 (1992); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). At the pleading stage, "[i]t is the responsibility of the complainant clearly to allege facts demonstrating that he [or she] is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

As it relates to the matter at hand, in order to properly establish an injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U. S. at 560.

1    For an injury to be particularized, it "must affect the plaintiff in a personal and individual way, it

2    must be distinct in that it requires that the plaintiff have personally suffered from some actual or

3    threatened injury – further, "[a]n injury must also be concrete." *Robins*, 578 U.S. at 339. That is

4    not to say, however, that all types of risk of harm cannot, by definition, satisfy concreteness. *Id*. at

5    341.

6    Here, Plaintiffs' first claim for relief asserts the denial of the substantive due process right

7    to reasonable health and safety in government custody. *See* FAC (dkt. 68) at 17-18. The Fifth

8    Amendment requires the government to provide conditions of reasonable health and safety to

9    people in its custody. *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020); *see also Youngberg v.*

10   *Romeo*, 457 U.S. 307 (1982) (substantive due process requires involuntarily committed mental

11   patients to be provide with such services as are necessary to ensure their reasonable safety). The

12   government violates a substantive due process right in this context when: (1) it makes an

13   intentional decision with respect to the conditions under which the plaintiff was confined; (2)

14   those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the government

15   does not take reasonable available measures to abate that risk, even though a reasonable official in

16   the circumstances would have appreciated the high degree of risk involved; and (4) by not taking

17   such measures, the government caused the plaintiff's injuries. *Roman*, 977 F.3d at 943.

18   Two things must be noted at the threshold. First, the allegations in Plaintiffs' FAC fall

19   short of making out a claim under all four of the elements of the test set forth in *Roman*. Plaintiffs

20   have essentially only alleged that *if* they contract COVID-19 in the future, and *if* their contracting

21   of COVID-19 is attended with serious symptoms, then Defendants' *might not* properly treat them.

22   Putting aside the FAC's conjecture and speculation, Plaintiffs factual allegations fall well short of

23   establishing any intentional decision on Defendants' part that would subject them to a substantial

24   risk of suffering serious harm due to which it can be said that Defendants have caused Plaintiffs

25   any injury. Second, when *Roman* was argued and decided in 2020, the situation regarding

26   COVID-19 was substantially different than what is presently the case (there were no vaccines,

27   protective gear such as masks and hand sanitizer were in short supply, and little was known about

28   how to treat the condition), and it was in that context that the court in *Roman* explained:

> We agree with the district court that the Government likely failed to meet its constitutional duty to provide reasonably safe conditions to Plaintiffs. At the time the injunction issued, Adelanto was so crowded that social distancing to combat the spread of the novel coronavirus was impossible, detainees had inadequate access to masks, guards were not required to wear masks, there was not enough soap or hand sanitizer to go around, detainees were responsible for cleaning the facility with only dirty towels and dirty water, detainees were compelled to sleep with less than six feet of distance between them, and not all new arrivals were being properly quarantined or tested. The Government was aware of the risks these conditions posed, especially in light of high-profile outbreaks at other carceral facilities that had already occurred at the time, and yet had not remedied the conditions. Its inadequate response reflected a reckless disregard for detainee safety.

*Id*.

Thus, Plaintiffs' reliance on *Roman*'s 2020 holding to make out their 2024 substantive due process claim based the paucity of the allegations they have pleaded in the FAC is misplaced, and the court finds that Plaintiffs' allegations fall short of stating a Fifth Amendment reasonable health and safety claim under the test set forth in *Roman*.

That said, the court will now turn to the Defendants' closely-related arguments regarding standing. Conceptually, there is a close correlation between standing and the justiciability issues of mootness and ripeness. Ripeness and mootness can be described as the time dimensions of standing. *See Burlington N. R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1242 (9th Cir. 1991) (quoting 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3532.1, at 130 (2d ed. 1984)). In general, courts "must determine whether . . . claims demonstrate sufficient ripeness to establish a concrete case or controversy." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 579 (1985) (citing *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 138-139 (1974)). Ripeness is a "question of timing" that seeks to prevent "the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Id*. In addition to requiring a concrete case or controversy, the ripeness doctrine demands that courts analyze prudential factors: the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Id*. at 581. It should be noted at this point that "[i]n measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing." *Thomas v. Anchorage Equal Rights*

*Com'n*, 220 F.3d 1134, 1138-39 (9th Cir. 2000) (internal quotation marks omitted). The concreteness element does not force a party "to await the consummation of threatened injury to obtain preventive relief. *If the injury is certainly impending, that is enough.*" *Union Carbide Agr. Prods. Co.*, 473 U.S. at 581-82 (emphasis added).[1] The plaintiff must simply show that he "face[s] '*a realistic danger* of sustaining a direct injury . . .*'" Anchorage Equal Rights Com'n*, 220 F.3d 1138-39 (emphasis added) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).[2] The threat must be genuine. *Id*. The genuineness of a threat of suit can be shown by a threat's specificity and a history of similar suits between the parties. *Id*. For these reasons, "a federal court normally ought not resolve issues 'involv[ing] contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996) (quoting *Union Carbide Agr. Prods. Co.*, 473 U.S. at 580-81).

Thus, "[t]he intersection of ripeness and standing can best be explained in part by the ripeness doctrine's requirement that adjudication of a particular matter not be dependent upon a contingent event in the future." *In re BofI Holding Shareholder Litig.*, 2018 U.S. Dist. LEXIS 96155, *23 (S.D. Cal., Jun. 7, 2018). "That is so because, if the contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012) (quoting *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009)). Therefore, claims must be dismissed if they are based solely on harms stemming from events that have not yet occurred, and may never occur, because the plaintiffs raising such claims have not "suffered an injury that is concrete and particularized enough to survive the standing/ripeness inquiry." *Alcoa, Inc.*, 698 F.3d at 793 (quoting *Bova*, 564 F.3d at 1096-97).

---

[1] As stated below, this is the essence of the flaw in Plaintiffs' allegations. That is, their allegations fall short of giving rise to the impression that the threatened injury of which they complain is "certainly impending."

[2] Here, the court is unpersuaded that Plaintiffs' allegations amount to establishing "a realistic danger." Instead, the danger manifest in their allegations is speculative and contingent at most because they have only alleged that *if* they contract COVID-19 in the future, and *if* it is attended with serious symptoms, then Defendants' *might* not elect to treat them with antiviral medications, which *might* subject them to serious health risks. There are too many contingencies involved in Plaintiffs' logical chain for the court to be able to conclude that they have established a realistic danger of sustaining a direct injury.

1         Here, the essence of Plaintiffs' Fifth Amendment claim regarding the substantive due
2 process right to reasonable health and safety in government custody rests on too many
3 contingencies for the court to conclude that any injury is sufficiently concrete and particularized to
4 survive the necessary standing / ripeness inquiry. At bottom, Plaintiffs appear to seek the court's
5 intervention in micromanaging Defendants' medical policies – and they seem to request that the
6 court undertake that task in the abstract; that is, without having alleged that there exists a realistic
7 danger of Plaintiffs' ever suffering any direct injury. As mentioned, Plaintiffs have only really
8 alleged that (1) they're not tested frequently enough for COVID-19; (2) that *if* they contract
9 COVID-19 they *might* develop serious symptoms due to their underlying health conditions; (3)
10 that *if* they contract COVID-19 *and* develop serious symptoms, Defendants *might not* treat them in
11 the most effective way – which they contend should involve administering an antiviral dose at a
12 time close to the manifestation of the symptoms. Plaintiffs simply have not alleged enough facts to
13 take their claim beyond the realm of speculation and conjecture. Plaintiffs have not alleged any
14 facts that might show the genuineness or specificity of the thereat of the alleged dangers of which
15 they complain (for example, by detailing a history of others detained at their facility who have
16 actually suffered direct injury due to Defendants' alleged failures in testing for and properly
17 treating COVID-19). Thus, Plaintiffs' first claim must be dismissed.

18        Through their second claim, and based on the same set of allegations, Plaintiffs plead
19 another substantive due process claim to the effect that their civil confinement has risen to the
20 level of punishment because the California Department of Corrections and Rehabilitation makes
21 frequent COVID-19 testing and antiviral covid medications available as part of the prison medical
22 care it provides while Defendants reportedly do not provide frequent testing or make such
23 medications available at GSA. *See* FAC (dkt. 68) at ¶¶ 54, 77-81. The gist of Plaintiffs' claim here
24 seems to be that "Defendants' failure to provide Paxlovid is unconstitutional punishment." *See*
25 Pls.' Mot. for Prelim. Inj. (dkt. 20) at 18-19.

26        "As civil detainees retain greater liberty protections than individuals detained under
27 criminal process, [] and pre-adjudication detainees retain greater liberty protections than convicted
28 ones, [] it stands to reason that an individual detained awaiting civil commitment proceedings is

12

1    entitled to protections at least as great as those afforded to a civilly committed individual and at
2    least as great as those afforded to an individual accused but not convicted of a crime." *Jones v.*
3    *Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (citing *Youngberg v. Romeo*, 457 U.S. 307, 321-24
4    (1982) (civilly committed individuals); and, *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979) (pretrial
5    detainees)). Thus, an individual detained under civil process – like an individual accused but not
6    convicted of a crime – cannot be subjected to conditions that amount to punishment. *Id*. In this
7    regard, "punitive conditions may be shown (1) where the challenged restrictions are expressly
8    intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive
9    purpose but are nonetheless excessive in relation to the alternative purpose, or are employed to
10   achieve objectives that could be accomplished in so many alternative and less harsh methods." *Id*.
11   (internal quotations and citations omitted).
12          There are two problems with Plaintiffs' second claim. First, Plaintiffs' FAC does not
13   present allegations that would satisfy the two-part test set forth above. Plaintiffs appear to have
14   fallen short of stating a substantive due process claim for punitive civil detention in that they have
15   not plausibly alleged that Defendants' failure to offer Paxlovid upon the manifestation of what are
16   believed to be, or are in fact, COVID-19 symptoms constitute "restrictions [that] are expressly
17   intended to punish," or that they are excessive or are employed to achieve objectives that could be
18   effectuated by less harsh methods. *Jones*, 393 F.3d at 932. More importantly, however, for the
19   reasons stated above with respect to the first claim, Plaintiffs have not alleged any injury or danger
20   that is non-contingent and sufficiently concrete and particularized to survive the standing/ripeness
21   inquiry.
22   //
23   //
24   //
25   //
26   //
27   //
28   //

**CONCLUSION**

For all of these reasons, the court finds that Plaintiffs' claims must be dismissed because they are based solely on harms stemming from events that have not yet occurred and may very well never occur. Thus, Defendants' Motion to Dismiss (dkt. 50) is **GRANTED**. Because it is not clear that leave to amend is incapable of remedying the defects described herein, Plaintiffs' FAC (dkt. 68) is **DISMISSED with leave to amend**. Plaintiffs shall have 60 days within which to file a Second Amended Complaint. Because Plaintiffs' operative complaint has been dismissed, their Motions for Preliminary Injunction (dkt. 20) and Class Certification (dkt. 21) are **DENIED**.

**IT IS SO ORDERED.**

Dated: May 20, 2024

ROBERT M. ILLMAN
United States Magistrate Judge